SAMUEL STONEBRAKER and HENRY K. HOFFMAN *vs.* HENRY STONEBRAKER.. CHARLES A. CLOTWORTHY and WILLIAM P. CLOTWORTHY *vs.* HENRY STONEBRAKER, and ABRAHAM S. STONEBRAKER *vs.* HENRY STONEBRAKER.

## *Trade-Marks—Injunction—Account.*

One tradesman has no right to use the trade-marks or names previously adopted and used by another, so as to induce purchasers to believe contrary to the fact, that they are buying the articles to which the marks were originally applied.

Trade-marks are property, and a person using such marks without the sanction and authority of the owner, will be restrained by injunction, even where it does not appear there was any fraudulent intent in their use, and will be required to account for the profits derived from the sale of goods so marked.

S having engaged in the manufacture of various medicines' and other preparations, adopted and used thereon certain labels and trade-marks to distinguish his medicines and preparations from all others. These labels and trade-marks were generally known to the trade and consumers, so that by them the preparations were recognized, distinguished and bought. The manufacture and sale of these preparations had become the source of profit and emolument to S. Certain persons thereupon fraudulently engaged in the manufacture of medicines and other preparations, and sold large quantities thereof, with labels and trade-marks ·corresponding with those used by S, or with only a colorable difference, and designed to deceive the public, and to enable the vendors to obtain for their medicines the celebrity which the medicines and preparations of S had in the market. On application by S, it was HELD:

That he was entitled to be protected by injunction, and to be compensated by having an account taken.

APPEALS from the Circuit Court of Baltimore City.

The bill of complaint in this case was filed on the 9th of July, 1867, by the appellee, against the appellants and Leonard Passano; it alleged, that prior to the years 1858 and 1859, the complainant, then residing at Funkstown; Maryland, directed his attention to the compounding of certain

medicines and preparations; that by diligent and laborious study, and careful and oft-repeated experiments, he succeeded in producing the following compounds, to each of which he gave the name by which it was respectively called, to wit: "Stonebraker's Nerve and Bone Liniment," "Stonebraker's Celebrated Hair Restorative," "Stonebraker's Balsam or Pain Killer," "Stonebraker's Dyspepsia Bitters and Liver Invigorator," "Stonebraker's Rat and Roach Exterminator," "Stonebraker's Horse and Cattle Powders," "Stonebraker's Vegetable Cough Syrup," and "Stonebraker's Bed Bug Exterminator."

The bill further alleged that the said preparations soon became of great repute, were advertised by the complainant in many of the States at great expense, and that the manufacture and sale thereof became the source of great profit and emolument to him; that he adopted and used on each of the said preparations certain labels or trade-marks, which were adopted by the complainant clearly to distinguish his medicines and preparations from all others; that the said labels and trade-marks became universally known to the trade and consumers, so that by them the said preparations were recognized, distinguished and bought; that not only did each of the said preparations thus become known to the trade and consumers by its distinctive name, but the whole of said preparations became known, as a class, by the name of "Stonebraker's Valuable Family Medicines and Preparations;" which name was adopted by the complainant as a general trade-mark, and by which name he at great expense advertised the same; that Samuel Stonebraker, an uncle of complainant, on or about the first day of June, 1864, embarked certain capital in said business and became jointly interested therein with the complainant; that about the middle of May, 1866, the said Samuel proposed to the complainant that if he would transfer the business to Baltimore, he the said Samuel would put $10,000 into the same; that Henry K. Hoffman of said city would put in a like amount; that a partnership could be formed be-

tween the complainant, the said Samuel and the said Hoffman, •and the said business be thus largely increased; that said proposal was acceded to and an agreement of partnership accordingly entered into. That after the business had been carried on under said agreement for about twenty months, a serious disagreement arose between the partners as to the proper construction of the agreement of co-partnership, that litigation resulted, and finally by agreement a dissolution of the co-partnership.

The bill further showed that by the terms of the agreement of dissolution, the said Samuel Stonebraker and H. K. Hoffman became entitled, among other things, to certain wrappers and labels of the assets of the said firm of Stonebraker, Hoffman & Company, which they were entitled to use only " for re-wrapping medicines coming back in bad order," and that the said Samuel Stonebraker and H. K. Hoffman bound themselves " not to manufacture or imitate Stonebraker's medicines or preparations, or sell any medicines under their names or titles respectively, except stock on hand or in the hands of agents; " and also bound themselves " not to take any interest in or have any interest in the manufacture of said medicines or preparations, or be in any way interested in the manufacture of them, or in the sale of any medicines under their names or titles or in imitation of them." The bill then charged, that at the time of the said dissolution there were on hand, large quantities of the said wrappers and labels, and that the said Samuel Stonebraker and H. K. Hoffman sold or pretended to sell and dispose of the stock on hand, including said wrappers, etc., to Wm. P. Clotworthy and Leonard Passano, with the full knowledge that said Clotworthy and Passano would, and with the fraudulent design and intention that they should, use the said wrappers, &c., for purposes for which, by force of said agreement, the said Stonebraker and Hoffman were not permitted to use them, to wit, upon articles to be manufactured by Clotworthy and Passano in imitation of the preparations of the complain-

ant; that the said Clotworthy and Passano and the firm of Clotworthy & Company, consisting of said William P. and Charles A. Clotworthy, had since said sale, with the full knowledge, approbation, participation and encouragement of the said Stonebraker and Hoffman, manufactured large quantities of articles in imitation of and counterfeiting some of the preparations of the complainant, and used upon the same the said wrappers and labels, and had offered the said imitations for sale as and for the genuine preparations of the complainant.

The bill further charged that the said Clotworthy and Passano, not content with imitating the complainant's preparations for the purpose of exhausting the wrappers aforesaid, had fraudulently confederated with Abraham S. Stonebraker, a brother of the complainant, to manufacture and sell upon an immense scale imitations and counterfeits of the complainant's medicines and preparations; that in pursuance of said fraud the said Clotworthy & Company and Passano, had manufactured immense quantities of said imitations, and had had printed and placed upon said imitations and counterfeits the said labels or trade-marks of the complainant, or counterfeits thereof, so slightly and colorably varied from those of the complainant as to give evidence of the most deliberate design to defraud the complainant, and to impose upon and deceive the trade and consumers, by inducing them to purchase the said imitations as and for the genuine preparations of the complainant.

The bill further charged, that the said W. P. Clotworthy and Passano had employed the complainant's brother in the business for no other reason than that his name was "Stonebraker," and because they believed that by employing a person of the same name as that of the complainant they could with impunity consummate their intended frauds against the complainant and the public; that the said Samuel Stonebraker and H. K. Hoffman had knowingly and wilfully aided and abetted the said Clotworthy & Company and A. S. Stonebraker in all the frauds charged; and that having reason to

believe the same, the complainant charged and averred that the said Samuel Stonebraker and H. K. Hoffman were secretly interested with the said Clotworthy & Company in the manufacture and sale of the said imitations, and the use of the said counterfeits.

The bill prayed that the defendants and each of them might be restrained by injunction from counterfeiting or imitating the trade-marks or labels used by the complainant in and about the sale of "Stonebraker's" medicines and preparations, and from using or issuing any such counterfeited or imitated trade-marks or labels, and from selling or delivering any medicines or preparations whatever with the labels or trade-marks of the complainant in any wise imitated or counterfeited thereupon; and further that W. P. Clotworthy, Charles A. Clotworthy, Leonard Passano and Abraham S. Stonebraker, might discover what quantity of medicines or other preparations had been manufactured and sold by them or either of them, with labels or wrappers containing the name of "Stonebraker," in conjunction with the descriptive name of each of said medicine or preparation, and the prices obtained therefor. The injunction was issued as prayed.

The answer of Abraham S. Stonebraker denied that the complainant was the original maker of the preparations mentioned in the bill, and claimed that he (A. S. Stonebraker) was the original *compounder of the same, and that the labels* and directions for the said medicines and preparations were written by him and given to the complainant, as then used by him, with only slight verbal alterations from the original form.

The answer of W. P. and Charles A. Clotworthy, trading as Clotworthy & Co., admitted that they had made an agreement with W. P. Clotworthy, Leonard Passano and A. S. Stonebraker, for the manufacture and sale of certain medicines and preparations, known and sold as "Dr. Stonebraker's Medicines and Preparations;" which they averred the said parties had the lawful right to make; they denied

all unlawful interference with the rights of the complainant, and all improper use of the labels of the late firm of Stonebraker, Hoffman & Co.; for the rest they adopted the answers of their co-defendants.

The answer of Samuel Stonebraker and H. K. Hoffman, admitted the sale to William P. Clotworthy and Leonard Passano, but denied that they had any interest in the remains of stock or in the business of the late firm of Stonebraker, Hoffman & Co., and denied that they had connived at any fraudulent or improper use of any part of the said remains of stock, or in any imitation or counterfeiting by any person whomsoever of any preparations or medicines, which the said persons had not the right to make.

The answer of Wm. P. Clotworthy and Passano, admitted the agreement with A. S. Stonebraker, to manufacture and sell for their joint account and profit, the medicines and preparations known as "Dr. Stonebraker's Medicines and Preparations," and the purchase of the remaining stock in trade of the late firm of Stonebraker, Hoffman & Co.; they adopted the answer of Dr. A. S. Stonebraker, as part of their own. They denied all improper use of the labels of Stonebraker, Hoffman & Co., or that they had imitated or counterfeited (or intended to do so) the preparations of the complainant.

A vast amount of testimony was taken, and after hearing, the following opinion was delivered by Judge PINKNEY:

The bill in this case is for an injunction and for an account, &c. A preliminary injunction was granted. And the case now comes before the Court for final hearing upon bill, answers and testimony.

The facts of the case are these: The complainant in the year 1856, was keeping store at Funkstown, in Washington county, in this State, with one J. Calvin Hoffman. In 1857, Hoffman sold out his interest in the store to the complainant, who about that time commenced the manufacture of patent medicines. The evidence shows that he then made and sold a medicine called "Sloan's Liniment." The year following,

17            v. 33

(1858,) it seems he failed in keeping store and began to manufacture "Patent" medicines and other preparations, as his sole business; he peddled them through the neighboring country, and from time to time added new medicines and preparations.  It appears from the evidence that in the year 1860, he was compounding and selling three or four different sorts, viz: "Stonebraker's Pain Killer," "Stonebraker's Nerve and Bone Liniment," "Stonebraker's Hair Restorative," and perhaps "Stonebraker's Horse and Cattle Powders," which preparations at that time he also consigned to agents in different parts of the neighboring country, as well in Virginia as in Maryland, and they became known to the trade and the public as "Stonebraker's Medicines."  It also appears by the evidence that he made great exertions to extend the reputation and sale of his medicines and other preparations, and was very successful in those respects, but in his money matters he does not seem to have got ahead.  In 1864, he was obliged to seek assistance from his uncle, the defendant, Saml. Stonebraker, who appears to be a man of some means, he put $10,000 into the business, and the complainant carried it on for several years as his agent.  The business became profitable, and the complainant extricated himself from his pecuniary embarrassments.

In the spring of the year 1866, he removed to Baltimore and formed a partnership with his uncle, Samuel, and the defendant, Henry K. Hoffman, under the firm name of *Stonebraker, Hoffman & Co.;* they entered extensively into the manufacture and sale of "Patent" medicines and other preparations, which were compounded by the complainant and sold as before, under the name of "Stonebraker's Medicines and Preparations."  Towards the close of the year a misunderstanding arose between the complainant and his co-partners.  They claiming a right to the recipes which were used in compounding the medicines and preparations, and he insisting that they were his secrets which he was not bound to communicate to his co-partners.  Legal proceedings were

instituted, but the difficulty was amicably arranged and the partnership dissolved by agreement under seal. By the terms of this agreement, his co-partners, Messrs. Hoffman and Saml. Stonebraker, released him from all claims for copies of recipes for the manufacture of "Stonebraker's Medicines and Preparations," agreed to take all manufactured medicines, &c., wrappers, &c., for wrapping medicines, &c., &c., bound themselves "not to manufacture or imitate 'Stonebraker's Medicines or Preparations,' or sell any medicines under their names or titles respectively, except such stock on hand or in the hands of agents," and also bound themselves "not to take any interest or have any interest in the manufacture of them or in the sale of any medicines under their names or titles, or in imitation of them." The complainant on his part, bound himself and his sons not to manufacture said medicines or to suffer his recipes to be used for the manufacture of said medicines within three months from the date of the agreement, and also bound himself and his sons not to sell said medicines within six months, except by or with the written consent of his late partners.

Several months after entering into the agreement, Messrs. Hoffman and S. Stonebraker, sold out all their interest under the same to their co-defendants, Messrs. L. Passano and Wm. P. Clotworthy, who it appears from the evidence soon after entered into an arrangement with the defendant, Dr. Abraham S. Stonebraker, (a brother of the complainant, and just previously a resident of the State of Illinois, where he had been a practising physician since the war,) to manufacture "Stonebraker's Medicines and Preparations," for the sale of which compounds they appointed the firm of Clotworthy & Co., who are also defendants in this Court, their general agents; Messrs. Clotworthy & Co., so appointed agents of Messrs. Passano and W. P. Clotworthy, addressed a circular notice to the local agents of "Stonebraker's Medicines and Preparations," thereby informing them that H. Stonebraker had no longer any interest whatever in those medicines and pre-

parations, that the old agents would be supplied by wagon as heretofore, that applications for agencies would receive prompt attention and medicines be forwarded free of expense. This circular was signed Clotworthy & Co., agents for proprietor. By another notice they informed dealers that it was their intention as agents of the proprietors, Messrs. Passano and W. P. Clotworthy, to advertise the articles (Stonebraker's Medicines and Preparations) extensively, and to make them standard and reliable preparations. In accordance with which notice they proceeded to enter extensively into the manufacture and sale of medicines and preparations under the name of "Dr. Stonebraker's Medicines and Preparations," using upon the wrappers of certain of their "Medicines and Preparations," certificates given to complainant in recommendation of *his* medicines and preparations.

Here let us pause. Can there be the slightest doubt, that had the defendants, Hoffman and Samuel Stonebraker, after their agreement with the complainant, by which they released him from all claim to the recipes for the manufacture of "Stonebraker's Medicines and Preparations," and bound themselves not to manufacture or imitate them, or sell medicines under their names respectively, except stock on hand, &c., begun to manufacture and sell medicines and other preparations, under the name of "Stonebraker's Medicines and Preparations," using the proper appellation of the several medicines and preparations by which they were known; I say, can any one doubt that it would be a fraud upon the complainant, and a grave violation of their agreement, and that upon the application of the complainant, the Court would restrain them by injunction? Is it less a fraud on the part of their assignees and their agents? And is the hand of the Court to be stayed, because of their association with the complainant's brother, Dr. Stonebraker? It is said so.

Upon what, then, does this pretension rest? There is evidence to show that Dr. Stonebraker, previous to the late civil war, while living at Shepherdstown, (to which place he

removed from Funkstown in the fall of 1858,) and keeping a drug store, manufactured patent medicines and sold them in the neighborhood. In 1860, he was manufacturing and selling under the name of "Dr. Stonebraker's Celebrated Compounds," "Stonebraker's Hair Restorative," "Stonebraker's Healing Balsam," "Stonebraker's Anodyne Astringent," "Magic Nerve and Bone Liniment," and "Stonebraker's Anti-Bilious Pills." He advertised his medicines in some of the county newspapers in his neighborhood, and also in the "New Star," a paper printed at Christiansburg, in south-western Virginia, where he had an agent, and he also sent some of his medicines to Illinois. In the winter of that year, (1860,) however, he failed in the drug business, and, according to his own testimony, was about commencing the manufacture and sale of his patent medicines, but the war broke out and blasted all his hopes, as it did those of many others. During the unhappy period of the war, he was in the Confederate army; after the war, he went to Illinois, where he practised medicine until the spring of 1867, when he came to Baltimore, and entered into his engagement with Messrs. Passano and Clotworthy for the manufacture of "Stonebraker's Medicines and Preparations." He now claims to have been the original compounder of the medicines which his brother Henry made and sold under the name of "Stonebraker's Medicines and Preparations," or most of them, and that he communicated the recipes to the complainant, but the evidence does not sustain this pretension. And his conduct, (as appears by the proof,) previous to his connection with Messrs. Passano and Clotworthy, is inconsistent with it.

While living in Illinois, he wrote to his brother, the complainant, congratulating him on his success in business, his removal to Baltimore, and his new partnership; and concludes his letter by saying: "If, at any time, you should want a pharmaceutical or financial clerk, with big pay and little to do, why I am open." He was a witness in the suit

between the complainant and his co-partners, where the controversy was in regard to the right to the recipes, which he now says he gave to his brother, but he then was perfectly silent in regard to his own claim to them. Mr. Hoffman, (the complainant's former partner,) he says, (in his testimony,) introduced him to Mr. W. P. Clotworthy, and he proposed to Mr. C. to enter into an arrangement for the sale of his medicines and preparations.

So it was from him, it seems, that Messrs. Passano and Clotworthy got the brilliant, but by no means original idea, as the cases of *Croft vs. Day,* 7 *Beav.,* 84, and *Rodgers vs. Nowill,* 5 *Man. Gr. & Sct.,* 109, show, of using his name for the purpose of palming upon the public their medicines as those of the complainant. No doubt Dr. Stonebraker had a right to enter into an agreement with Messrs. Passano and Clotworthy, or any body else, to manufacture and sell his own medicines, but he had no right to *lend* or *sell* his name to perpetrate an injury upon his brother and a fraud upon the public. The evidence shows, beyond the shadow of doubt, that the whole agreement between all the parties was but a combination to deceive the public, and to enable the parties to it to obtain for their medicines the benefit of the celebrity which the complainant's medicines and preparations had in the market, at the expense of the complainant, and in fraud of his rights.

The principle upon which relief is given is, that one man cannot offer his goods for sale, representing them to be the manufacture of another man; and in this case I do not think it necessary to go into a particular and comparative examination of the different wrappers and labels made use of by the parties, for the different sorts of medicines and preparations made and sold by them respectively. I recognize the principle stated and applied in the late English case of *Seixo vs. Provezende,* 1 *Chan. Appeals L. R.,* 192, by Lord CRAN-WORTH, to be correct and applicable to the present case. His Lordship said: "I do not consider the actual physical

resemblance, of the two marks to be the question for consideration. If the goods of a manufacturer have, from the mark or device he has used, become known in the market by a particular name, I think that the adoption by a rival trader of any mark which will cause his goods to bear the same name in the market, may be as much a violation of the rights of that rival as the actual copy of his device." And in the case of *Coffeen vs. Brunton*, 4 *McLean*, 516, Judge McLEAN said: "In the case under consideration, in his label, the complainant calls his medicine the "Chinese Liniment;" the defendant calls his the "Ohio Liniment," but from the body of the labels, and of the directions for the use of the medicines, it is clear that the language of the defendant is so assimilated to that of the complainant as to appear to be the same medicine, the alteration being only colorable. There would seem to be no doubt that the intention of Loree, who prepared the liniment sold by the defendant as his agent, was to avail himself of the favorable reputation acquired by the "Chinese Liniment" in the sale of his, and by most persons it would be received as the same medicine." And, therefore, an injunction was granted.

In this case the defendants have used the *name of the complainant*, which he used to designate the medicines and preparations as *his*, with the addition of *doctor ;* that is, Dr. Stonebraker's Medicines," &c.; they have used the names used by him to designate the specific articles; they have used on their wrappers and labels the language of the complainant on *his* wrappers and labels; and they have gone further, as if to leave no doubt of their fraudulent intent, and have printed on the wrappers of some of *their* medicines and preparations the certificates given to the complainant in recommendation of his medicines and preparations.

Finally, the evidence shows, that the design of the defendants to impose their medicines and preparations upon the market, as those of the complainant, was a *perfect success.* They were even able to mislead and deceive such experienced

druggists as Mr. Gosmon, Mr. Erickson and Mr. Francis Volk.

In accordance with the foregoing opinion the Circuit Court, on the 11th of March, 1869, passed a decree perpetually enjoining and restraining Samuel Stonebraker and Henry K. Hoffman, their agents, and all persons claiming under them, from manufacturing or imitating any of the medicines or preparations, which prior to the 10th of December, 1866, had been known as "Stonebraker's Medicines or Preparations," and from selling any medicines whatsoever under the names or titles of said medicines or preparations, respectively, except stock in the hands of Stonebraker, Hoffman & Co. on the said 10th of December, 1866; and likewise perpetually restraining and enjoining all of the defendants, their agents, &c., from counterfeiting or imitating the trade-marks, labels, &c., used and employed by the complainant upon his medicines and preparations; and further directing that the defendants should account with the complainant for any and all medicines and preparations, manufactured or sold, or in anywise disposed of by them, since the 10th of December, 1866, with the labels, trade-marks, &c., of the complainant, affixed thereto.

From this decree the present appeals were taken.

The cause was argued before STEWART, BRENT, MAULSBY, MILLER and ROBINSON, J.

*Charles Marshall, I. Nevett Steele* and *William Schley,* for the appellants.

The appellee is not entitled to the aid of a Court of Equity. In the outset of his career as a compounder of nostrums, he improperly assumed the title of Doctor of Medicine, and at a later period he satisfied himself with publishing, without correction, testimonials in which he was addressed as Dr. Stonebraker. He was fully aware of the advantage of the title of Doctor, in recommending his medicines to the public, and availed himself of it, thereby practising an imposition. The

rule of law is clear. No matter what may have been the conduct of the defendants, a Court of Equity will not lend its aid to protect rights acquired by fraud and misrepresentation. It is enough if the misrepresentation was calculated to deceive. It is not pretended that the appellee had any right to advertise his compounds as the preparations of a Doctor of Medicine. Nor is it denied that if any person bought his preparations under the belief that he was a Doctor, that person has been deceived. The injunction of the Circuit Court, in terms, secures to the appellee the right to continue to impose on the public. The appellee is not entitled to relief. *Fetridge vs. Wells,* 13 *Howard Prac. Reps.,* 386–394; *Perry vs. Truefit,* 6 *Bevan,* 66; *Hobbs vs. Francais,* 19 *Howard Prac. Reps.,* 571; *Flavell vs. Harrison,* 19 *E. Law and Eq.,* 15; *Palmer vs. Harris,* 8 *Am. Law Reg.,* (*N. S.,*) 137; *Pidding vs. How,* 8 *Simons,* 477; *Partridge vs. Menck, Howard's Appeal Ca.,* 547; *Upton on Trade-Marks,* 30–46; 3 *Daniel's Ch. Pr.,* 1754, 1755; *Millington vs. Fox,* 3 *M. & C.,* 338; *Clark vs. Freeman,* 11 *Beavan,* 112; 8 *Vesey,* 226; *The Leather Cloth Co. vs. The American Leather Cloth Co.,* 11 *H. L.,* 523; *Walcot vs. Walker,* 7 *Ves.,* 1.

But it is submitted that the appellee not only practised deception in assuming the title of M. D., but that he attempted to deceive the ignorant and credulous, by misrepresentations as to the virtues of his nostrums, and that a Court of Equity will not protect a Quack. *Smith vs. Woodruff,* 48 *Barbour,* 438; *Fetridge vs. Wells,* 13 *Howard Pr. Reps.,* 394–397; *Fowle vs. Spear,* 7 *Pa. Law Journal,* 176, *and* 1 *Law Rep., New Series,* 130; *Pidding vs. How,* 8 *Simons,* 477; *Canham vs. Jones,* 2 *V. & B.,* 218; *Newberry vs. James,* 2 *Merrivale,* 441.

Even if it were conceded that the appellee was the originator of all the compounds mentioned in the evidence, and first made and sold them under the names given to them, yet if he permitted A. S. Stonebraker to advertise and sell them as his own, without complaint, his right to interfere with him is gone. *Taylor vs. Carpenter,* 2 *Woodbury & Minot,* 1–20.

Before the appellee can have an injunction, he must establish clearly his *title* to the alleged trade-marks, and this he must do by proving an original use of the words composing the trade-mark, by himself in connection with the articles designated by the trade-mark. Originality in the manufacture of the compounds themselves is not enough. Any one may manufacture these medicines who may possess the recipe. But if the appellee has shown that he *first* used the names by which the compounds are known, and that he used those names in writing or printing, so as to be visible, and that he used them in connection with the articles themselves, he has acquired a property in the names, otherwise he has not; and, to get an *injunction*, he must establish these facts clearly. *Rodgers vs. Nowill,* 6 *Hare,* 325; *Motley vs. Downman,* 3 *My. & Cr.,* 17; *Bacon vs. Jones,* 4 *My. & Cr.,* 433; *Coffeen vs. Brunton,* 5 *McLean,* 256; *Morrison vs. Moat,* 9 *Hare,* 255; *Wyeth vs. Stone,* 1 *Story's Rep.,* 282.

Dr. A. S. Stonebraker had the right to make compounds and sell them under his professional name, and cannot be enjoined from so doing, especially by a party who has no right to that title. *Burgess vs. Burgess,* 17 *Eng. Law and Eq.,* 257; *Upton on Trade-Marks,* 107.

Even if the appellee was the originator of these trademarks, he had no right to an injunction, because they had been previously appropriated by Dr. Stonebraker, without objection on the part of the appellee. *Upton on Trade-Marks,* 87.

The decree is manifestly erroneous so far as Samuel Stonebraker and Hoffman are concerned. It requires them to account to the appellee, "for all medicines and preparations whatsoever, by them or either of them since December 10th, 1866, manufactured or sold, or otherwise disposed of under any of the names hereinbefore fully set out, and wherewith they have used or employed any of the labels, trade-marks, wrappers, signs, handbills, or other devices or tokens which have been produced or given in evidence under the commissions in this cause." This will require Samuel Stonebraker

and H. K. Hoffman, to account to the appellee for the sales they made of the stock on hand, taken by them from Henry Stonebraker under the agreement of dissolution of December 10th, 1866; although their right to sell that stock and use the labels and wrappers for that purpose is not denied, and is even recognized in the opening of the decree. The above part of the decree would also require William and Charles Clotworthy and Passano to account for sales of the part of said stock, bought by them from Samuel Stonebraker and H. K. Hoffman. The appellee is not entitled to such an account under any circumstances.

*Robert D. Morrison* and *S. Teackle Wallis*, for the appellee.

The following authorities were referred to and relied on: *Seixo vs. Provezende,* 1 *Ch. App. C.* (*Law Rep.,*) 192; *Ainsworth vs. Walmsley,* 1 *Eq. Ca.* (*Law Rep.,*) 518; *Hall vs. Borrows,* 10 *Jur.,* 55, 550; *Sykes vs. Sykes,* 3 *Barn. and Cressw.,* 541; *Croft vs. Day,* 7 *Beav.,* 84; *Rodgers vs. Nowill & Rodgers,* 5 *M., Gr. and Sc.,* 110; *Taylor vs. Taylor,* 23 *Eng. L. and Eq.,* 281; *Walton vs. Crowley,* 3 *Blatchf. C. C.,* —; *Amoskeag Manufac'g Co. vs. Spear,* 2 *Sandf.* (*S. C.,*) 599; *Taylor vs. Carpenter,* 2 *Sandf.* (*Ch.,*) 603; *Clark vs. Clark,* 25 *Barb.,* 76; *Williams vs. Spence,* 25 *How. Pr.,* 366; *Binninger vs. Wattles,* 28 *How. Pr.,* 206; *Partridge vs. Menck,* 2 *Barb. Ch.,* 101; *Fetridge vs. Merchant,* 4 *Abb. Pr.,* 156; *Coffeen vs. Brunton,* 4 *McLean,* 516.

BRENT, J., delivered the opinion of the Court.

These appeals are brought before us upon a record of unusual size, which we have examined with a great deal of care and patience. The proof upon both sides has been very elaborate, and the case rests almost entirely upon questions of fact. As was said by Lord LANGDALE, in the case of *Croft vs. Day,* "what is proper to be done in cases of this kind must more or less depend upon the circumstances which attend them."

The bill asks for an injunction to prohibit the appellants from using the trade-marks of the appellee, and for an account. The law of trade-marks, as applicable to this case, may be very briefly stated. While a party has the right to manufacture and sell any article he may please, not protected by letters patent granted to another, he has no right to use the trade-marks or names previously adopted and used by another trader, and induce thereby the public to believe the articles sold are another's manufacture. Trade-marks are property, and as such the title to them will receive the protection of the Courts. If used by another, without the authority or sanction of the owner, he will be restrained by injunction, and that even where it does not appear there was any fraudulent intent in their use. He will also be held to account for the profits derived from the unauthorized use of such trade-marks. *Croft vs. Day,* 7 *Beav.,* 89; *Farina vs. Silverlock,* 39 *Eng. L. & Eq.,* 516; *Millington vs. Fox,* 3 *My. & Cr.,* 338; *Upton on Trade-Marks,* 233, 234; *Kerr on Injunctions,* 489.

We are relieved from the necessity of reviewing at length the facts and circumstances of this case, and we omit embodying them here because of the unusual space which would be required to set them out. They are so well considered and stated in the opinion of the Judge below, that we cannot better express our own views than by adopting, as we do, what he has said in reference to them. We are fully satisfied, from all the proof, that the trade-marks and certificates in question belong to Henry Stonebraker, and that they have been improperly, and without authority or excuse, appropriated and used by the appellants, either by themselves or through their contrivance. That there is some difference in those used by the appellants, there is no doubt. But the change is of such a character as to indicate an evident purpose to deceive. Nobody can look at the two—the genuine and the imitation—without being satisfied that the genuine have been so altered, and so craftily used and employed, as to be well calculated to

produce, upon the public mind, the impression that the medicines and preparations sold by the appellants are the medicines and preparations of the appellee, Henry Stonebraker. That Samuel Stonebraker and Henry K. Hoffman were both connected with and actively advanced the arrangement effected with Dr. Abraham S. Stonebraker, by which medicines and preparations have been manufactured and sold under the prohibited trade-marks, the weight of evidence abundantly establishes. The other appellants were, beyond doubt, connected with the sales, and as we have determined that the trade-marks and testimonials in question are those of the appellee, their liability is clear. We need only add, that we fully concur in the conclusions of the Court below, and are of opinion that the appellee, Henry Stonebraker, is entitled to be protected by injunction, and to be compensated by having an account taken.

The decree of the Court below is correct in so far as it proceeds to restrain and enjoin the appellants. But that part of it which directs an account, is in some respects erroneous. Samuel Stonebraker and Henry K. Hoffman, by the terms of dissolution of the partnership between themselves and Henry Stonebraker, dated the 10th of December, 1866, reserved the right to sell under these trade-marks the stock on hand or in the hands of agents at the time of dissolution, and for the sales of such stock, no matter by whom made, whether by themselves or their vendees, no account can be demanded. The other parties, Passano, Abraham S. Stonebraker and the Clotworthys, not being bound by any contract to the contrary, had the right, under the law as we have stated it, to manufacture the medicines or preparations to whatever extent they chose, and no accounting for such, as they manufactured simply, can be required of them. Their liability to account is limited to *sales,* under the prohibited use of the protected trade-marks, of such articles as were not part of the stock referred to. The decree is undoubtedly erroneous in requiring an account, as by its terms it clearly does, from these par-

ties, of articles which they have manufactured and not sold, and should more clearly except from all accounting, by any of the parties, for sales of such articles as constituted part of the stock on hand and held by the Stonebrakers and Hoffman at the time of the dissolution of that firm. In all other respects the decree is correct; but, for these errors, it must be reversed and the cause remanded, in order that a new decree may be passed by the Circuit Court in conformity with the views expressed in this opinion. As the decree is in the main correct, but for the reasons stated must be reversed, the costs in this Court will be equally divided, one-half to be paid by the appellee, and the other half by the appellants.

*Decree reversed and cause remanded.*

(Decided 7th July, 1870.)