## SAWYER *v.* HORN.

*(Circuit Court, D. Maryland.   January 17, 1880.)*

TRADE-MARK—FRAUD—INJUNCTION.—A court of equity will restrain the fraudulent imitation of a package and label, although they do not technically constitute a trade-mark, where the public are thereby misled into purchasing the goods of the imitator as those of the original manufacturer.

MORRIS, J. The bill alleges that the complainant, Henry Sawyer, of the city of Boston, in the state of Massachusetts, has been for about 20 years engaged in the manufacture of bluing; that his bluing has an extended and desirable reputation in the markets of the United States, and especially in Baltimore, where it has been and now is regarded as an article of great excellence, and has been sold in Baltimore and elsewhere in large quantities.

That in order to identify the bluing made by him and distinguish it from all others, complainant devised and adopted, as a trade-mark, certain marks, symbols and devices, and a form of package, none of which had been before at any time applied or used in connection with bluing, and which have continually, ever since, been used by him to identify his bluing.

That the marks so adopted were:

1. A red disk, applied on the top of the box, which had been first used by him in 1863, and had been registered by him, according to the statutes of the United States, as a trademark.

2. Certain pictorial representations of his boxes, which he used as part of the labels, applied to the outsides of the packing boxes, in which the small boxes containing the blue were packed for market.

3. An allocation or combination, consisting of words printed in bronze letters on blue paper, constituting the label surrounding the small boxes containing the blue.

And also a new and original and peculiar form of package or box to contain the blue, consisting of a cylinder, having a top of metal, perforated with holes, sealed with red sealing-wax.

Also a packing box with certain distinctive labels before mentioned, in which the cylindrical boxes were so packed and arranged that upon being opened nothing was exposed to sight but the red tops.

And the bill charges that the respondent Horn is engaged in Baltimore in the business of manufacturing blue, and, knowing the high reputation of complainant's goods as iden-

tified by his said marks and labels and peculiar appearance, has for his own profit, and to the injury of the complainant, been selling bluing put up in boxes made in imitation of complainant's, and had attached to the boxes palpable imitations of complainant's trade-marks.

And that said respondent, Horn, had 'wilfully and fraudulently put up his bluing in packages substantially the same in every material respect and having substantially the same general appearance as those of complainant, and had packed the same in the precise form and manner originated and used by the complainant, and had sold the same as and for the bluing of the complainant.

The bill further alleges that the respondent's imitation of the complainant's peculiar form of package, labels and manner of packing created confusion in the market, and misled and deceived purchasers who were familiar with and desired to obtain complainant's goods, and that respondent's goods were inferior and sold at a less price than complainant's.

The bill prays for an injunction and account.

These are in substance the more important allegations of the bill.

The respondent's answer admits that the complainant is a manufacturer of bluing as alleged, but denies that prior to 1878 the complainant ever claimed any of the alleged symbols, marks, or form of package as his trade-mark, or that he has ever attached to his bluing anything in the nature of a trade-mark, except the *fac simile* of his signature, the dates of the patent and reissue obtained by him, and the word "Crystal;" and respondent alleges that the red top of the boxes, the blue color of the label, the lettering, type, phraseology, green box, and other matters claimed by complainant in his bill, are such as belong to commerce and the public in general, and are not susceptible of exclusive appropriation by any one.

Respondent further alleges that complainant had, in the year 1864, obtained a patent for the said box containing his bluing, in which it was described as a package or case, which, when made with distributing holes and filled, is cemented by wax or a wafer, which patent was afterwards held to be void.

That the red top was produced by the application of Venetian red, for the purpose of stopping the perforations in the top of the package until required to be opened for use, and that the claim of the red top as a trade-mark was an after-thought of the complainant, suggested as a means of continuing his monopoly after his patent was annulled. That it was not a proper subject of registration as a trade-mark, had never been used or applied as described in the certificate of registration, and was but the ordinary use of a cheap and well known red material as a cement to close the perforations of the box, and when so applied became part of the box itself, and not in any sense a trade-mark.

Respondent further claims that the pictures used by him on the lids of his larger packing boxes were simply pictures free to be used by any one, and alleges that the form of package, labels and other marks claimed by complainant are not original or peculiar, but had been long used by many persons in the same trade.

The respondent admits that he does put up and sell a bluing in boxes having a resemblance in form to those sold by the complainant, but denies that he has done so fraudulently, or that he has ever done so in imitation of the complainant's bluing, or ever done anything not warranted by a fair competition in business, and denies that he has ever offered to sell any of his goods as and for the goods of the complainant, or sold any goods bearing any marks belonging exclusively to complainant, or any false representations thereon calculated to create confusion, and cause his goods to be purchased as and for the goods of the complainant.

He admits that he sells his goods cheaper than the complainant, but alleges that he gives as good an article for less money.

The case now comes on for final hearing, and we have been greatly assisted by the careful and thorough manner in which the facts have been presented, and by the able arguments of counsel, and the very numerous exhibits which have been brought to our attention illustrating and explaining the facts

in this controversy, and also many of the subjects of controversy passed upon in the cases cited in argument.

It appears that the complainant Sawyer in 1863 began using the present form of box as a convenient method of putting up washing blue in a dry powder, and that he began to distinguish them by using a red colored top in 1866.

He used a box, which is a small cylinder of wood, about an inch in diameter, and about two inches high. The box, when filled with the blue powder, is covered by a tin top, with a flange fitting over the top of the box. The tin cover is perforated with five small holes, so that when needed for use the blue powder can be sifted out as from the ordinary pepper, caster or dredging box. Until needed for use the perforations are closed by something in the nature of sealing wax, by pricking which the perforations can be opened.

This device was supposed by the complainant to be patentable, and he did obtain therefor a patent dated January 5, 1864, reissued October 1, 1867, but by a decree of the circuit court for the southern district of New York this patent was held to be void, and that decree, upon appeal to the supreme court, has, since the argument of this case, been affirmed.

The bluing manufactured by the complainant and offered in packages of this form obtained great favor and became well known, and has been the source of large profits. It became well known not only in Massachusetts, where complainant's place of manufacturing is, but in Baltimore, where he has sold large quantities since the year 1871.

Upon the cylindrical box of the complainant he has, since 1866, used a label of dark blue paper, printed in silver letters, which completely envelopes the box, and the metal top is covered entirely by a coating of Venetian red and varnish, so that the box, when standing upright, presents nothing but the blue label and the red top.

The quantity of red cement used is in excess of the quantity necessary to be applied, simply to cover the five small perforations in the metal top, and not only completely covers all the top, but extends nearly a quarter of an inch down the sides of the box, enveloping the whole metal covering.

The box and label and top which the respondent uses is similar in size, shape and appearance, so that, except for the words on the label and the color of the printing, which is in gold bronze instead of silver, and a hardly observable difference in the shade of the red color on the top, there is nothing to distinguish them, and unless the two are side by side and attention has been freshly called to these differences, no one can discriminate between them.

They both present the appearance at a little distance of a blue cylinder, with printing in gilt letters, with a red top of sealing-wax.

The respondent states that he was by trade a stone-cutter, and for a while kept a grocery store, and about 1873 began putting up bluing. That from the first he used the cylindrical box and blue label, but not the red top, and that about 1876, learning that Sawyer's patent had been held void, and supposing it was the red top which had been the subject of the patent, he then began to use the red top.

The labels, when compared, show that they are precisely of the same size and color. Both are divided by vertical lines into four sections of precisely the same sizes, but the words printed on them are different.

On Sawyer's label is printed horizontally:

Sawyer's

Chrystal

Blue

and

Safety box:

Patent Jan. 5th, 1864;

re-issued Oct. 1st, 1867.

Then vertically and enclosed by the vertical lines:

The Standard Blue of America. This form is the best and cheapest method of using Bluing. The quality is unexcelled.

Directions:

Pierce the prints on the top with a pin, and shake a few

grains into a cup of soft water; then stir in the rinsing water.

Prepared by H. Sawyer,
Boston, Mass.
H. Sawyer.
(fac simile of signature.)

On Horn's label is printed, with exactly the same divisions by straight lines, and in almost the same type, horizontally:

Horn's
unexcelled Sifting box
Blue.
Baltimore.
The Standard Blue of the United States.
The quality is unequaled.

Directions:

Pierce the holes of the top with a pin, and sift a few grains in a bowl of water, stir until fully dissolved, then add to the rinsing water.

Prepared by
Jas. G. Horn,
Baltimore, Md.

No one, we think, having the two labels before him, could believe that the similarities were the result of accidental coincidence. And no one having before him the two boxes, with their similar blue labels and red tops, could fail to be convinced, we think, that there was an intentional similarity in their general appearance, well calculated to deceive persons exercising ordinary caution into mistaking one for the other.

The name and place of manufacture on the labels are different, and many of the words, but the color, size, type, and arrangements and divisions are in such exact similitude in all respects as to divert attention from the differences and to produce the impression that they are the same.

The labels, if pasted upon a flat surface, could with less difficulty be distinguished from each other, but when pasted around a small cylinder, in such a way that only about a fourth

of the surface can be seen at one time, it becomes a matter of painstaking comparison to detect the differences.

The proof and the exhibits also show that these cylindrical boxes are packed by Sawyer by putting four dozen of them into a square, green, paper box just deep enough to contain them when standing upright, and when the lid is taken off nothing is seen of the cylindrical boxes, as they pack very close to each other, but the red tops, and the appearance is that of an almost solid, square mass of red scaling-wax.

And the proof and exhibits show that the respondent packs his cylindrical boxes in precisely the same way, presenting precisely the same appearance. These large boxes of Horn's being of the same color, and having on them labels very similar in designs and color to those of the complainant.

We are satisfied, from an inspection of the exhibits, that the general similarity between the goods of the complainant and respondent in all these respects could not have resulted from accident, but must have been the result of intention, and that the general resemblance is so great as to lead to confusion; and that a purchaser who had been in the habit of getting Sawyer's goods would have to exercise unusual and peculiar care not to take the goods of Horn if they were offered to him.

And, as matter of fact, the depositions of a large number of persons who themselves use the blue for washing purposes in Baltimore were produced, who testified that they knew of Sawyer's blue only by the appearance of the box, and, having been in the habit of using Sawyer's blue, and expecting to get it, had taken Horn's blue when offered them by retail dealers, supposing it was what they had been in the habit of using, knowing it only by the red top and blue box.

Being satisfied that these are the facts as proved by the complainant, we are now to consider the law applicable to them, and what is the remedy, if any, to which the complainant is entitled.

As to the simple question of trade-mark, we think the respondent is sustained in the position taken by him. The red top being, as to its use, a covering for the perforations in the metal top, and as to its color and material one of the

most common of all the cements used to close and seal the
mouths of jars, bottles, cans and similar packages, and there
being impressed on it no mark or design, it cannot, we
think, be said to be a trade-mark, and cannot be exclusively
appropriated by the complainant; nor can the form of his box,
it having been decided not to be a patentable contrivance, be
monopolized by him; nor can the color of the label, nor the
allocation of words thereon, nor the type, be exclusively
appropriated. The word "chrystal," as applied to bluing,
may be his trade-mark if he first so applied it, and the *fac
simile* of his autograph signature, but these are all; so that
it does not appear, as to anything which the complainant
can call technically a trade-mark, that the respondent has
been guilty of piracy or imitation.

But we do find that the respondent has been guilty of im-
proper and inequitable conduct, to the injury of the com-
plainant, in having designedly so put up, labeled and packed
his goods that purchasers, for whose use they are intended,
are misled and deceived, and do get Horn's blue, when they
desire and suppose they are getting Sawyer's. And that Saw-
yer, the complainant, having, after many years of manufac-
ture, established a market and demand for his goods, as known
by their peculiar and distinctive appearance, which he was the
first to adopt, is now deprived of profits which he would otherwise
obtain, by the fact that, after he had so established a reputa-
tion and demand for his goods, the defendant, with the in-
tention of getting the benefit of that reputation and demand,
has put his goods on the market prepared with such close
imitation of the complainant's that they are mistaken for his.

The respondent, while he denied (and there is no evidence
whatever to the contrary) that he ever represented or author-
ized any one to represent that his goods were Sawyer's, does,
in his testimony, admit that he put up his goods with the
appearance they now have because it was "fashionable," and
because he found that a blue box with a red top made them
more salable; and as he sells his goods to the grocers at
50 cents for four dozen, while Sawyer has been accustomed
to sell his for 85 cents, it is easy to see that the grocers pre-

fer to give their customers Horn's goods, if they will take them, as both retail at about the same price.

It has been said that the fundamental rule applicable to such cases is that one man has no right to put off his goods for sale as the goods of a rival dealer, and that "he cannot, therefore, be allowed to use names, marks, letters or other *indicia* by which he may induce purchasers to believe that the goods which he is selling are the manufacture of another person." *Perry* v. *Truefitt,* 6 Beav. 66–73. And this principle has been recognized as applicable in cases which were not strictly cases of technical trade-marks by many well considered decisions.

In *Williams* v. *Johnson,* 2 Bosworth, 1, decided in 1857 by Chief Justice Duer and Associate Judges Hoffman and Woodruff, upon appeal to the general term of the supreme court of New York, without deciding whether or not the complainant was entitled to the use of the words "Genuine Yankee Soap," which he claimed as his trade-mark, the court held that the imitations of the size, shape, style, labels and substantial appearance of the complainant's goods by the defendant was a fraud, and that he was entitled to protection, and decreed that the defendant should be enjoined from using the labels, devices and hand-bills which he had been using, and from using any other similar ones, calculated to deceive the public or create the belief that the soap sold by the defendant was the soap made and sold by the complainant.

*Croft* v. *Day,* decided in 1843, (7 Beav. 84,) was not a case of trade-mark strictly, but of the use by two persons, one named Day and the other named Martin, composing a new firm of Day & Martin, of boxes and labels for putting up blacking similar to those which had been for many years used by an old firm of Day & Martin. In giving the reasons for his decision Lord Langdale, the master of the rolls, said: "The accusation which is made against the defendant is this: that he is selling goods under forms and symbols of such a nature and character as will induce the public to believe that he is selling the goods which are manufactured at the manu-

v.1,no.1—3

ιactory which belonged to the testator in this cause. I stated on a former occasion that in my opinion the right which any person may have to the protection of this court does not depend upon any exclusive right which he may be supposed to have to a particular name or to a particular form of words. His right is to be protected against fraud. It is truly said that if any one takes upon himself to study these two labels he will find several marks of distinction. On the other hand the colors are of the same nature, the labels exactly the same size, the letters are arranged precisely in the same mode, and the very same name appears on the face of the jars. It appears to me that there is quite sufficient to mislead the ordinary run of persons, and that the object of the defendant is to persuade the public that this new establishment is in some way or other connected with the old firm, and at the same time to get purchasers to go to 90½ Holburn Hill, and not to 97 High Holburn. I think what has been done is quite calculated to effect that purpose, and the defendant must be restrained.

"My decision does not depend on any peculiar or exclusive right the plaintiffs have to use the names Day & Martin, but upon the fact of the defendant using those names in connection with certain circumstances, and in a manner calculated to mislead the public, and to enable the defendant to obtain, at the expense of Day's estate, a benefit for himself to which he is not in fair and honest dealing entitled."

In the case of *Holloway* v. *Holloway*, (1850,) 13 Beav. 209, the plaintiff having established a reputation for preparations known as Holloway's pills, and ointment, his brother Henry began to sell H. Holloway's pills and ointment, put up in similiar boxes, and with labels and wrappers similar to plaintiff's. The master of the rolls said that, although the defendant had a right to constitute himself a vendor of Holloway's pills and ointment, he had no right to do so in such way as to deceive the public, and make them believe he was selling the plaintiff's medicines, and that he could not be allowed to perpetrate such a fraud.

In the leading case of *The Leather Cloth Co.* v. *American*

*Leather Co.* 11 Jur. (N. S.) 513, upon appeal to the house of lords the case was finally disposed of upon the ground that the alleged trade-mark was simply an advertisement of the quality of the goods, and that it was in both cases printed in very large type, in a circle more than six inches in diameter, easily read and hardly to be mistaken one for the other; and Lord Cranworth, in dismissing the case, says: "I mention this because if, instead of occupying this large space, the whole had been engraved on a stamp of the size of a shilling, so as not to be capable of being read without close examination, the case would have been different."

In the case of *Dixon Crucible Co.* v. *Guggenheim*, decided by Judge Paxson in 1870, (2 Brewster, 321,) although there was no technical trade-mark, to the exclusive right of which the plaintiffs were entitled, the fact that the defendant's packages of stove polish were in size, shape and labels obviously a fraudulent imitation of the complainant's, induced the court to grant relief; although it was shown that the wholesale dealers generally understood the difference, and only the consumers were likely to be deceived.

And in that case, although reference is made to a Pennsylvania statute intending to restrain the counterfeiting of private stamps and labels, the reasons given by the learned judge for his decision are based entirely upon general principles adduced from the authorities cited by him.

The case of *Enoch Morgan's Sons & Co.* v. *Schwakhoffer*, in the supreme court of the city of New York, was decided upon the same principle. The plaintiffs adopted the name of "Sapolio" as a trade-mark for their goods, and it became known by that name, and by the peculiar and distinctive style of packages, labels and wrappers in which it was put up. The defendant began manufacturing the same kind of goods and adopted the name "Sophia" as his trade-mark, and adopted the same style of package, with labels and wrappers which, through a careful inspection, disclosed were different in almost every particular, and had the defendant's own name on them, yet the court, finding that the defendant's goods were in appearance so close an imitation of the plain-

tiffs' that consumers of ordinary caution did receive one for the other, and finding that the imitation was designed to mislead purchasers, enjoined the defendant.

The case of *Stonebraker* v. *Stonebraker*, 33 Md. 252, is also a well considered case in which an injunction was affirmed by the court of appeals of Maryland, preventing the use of labels upon medicinal preparations similar to those used by the complainant.

The case of *McLean* v. *Fleming* (96 U. S. 245, October term, 1877) is a late and authorative decision by the United States supreme court of questions similar to those arising in the present case, and the principles announced in that decision are, it seems to us, conclusive on the point that the right to a technical trade-mark, in the strict sense of the word, is not necessary to entitle the complainant to relief. For, although the complainants had, in that case, registered their label as a trade-mark, under the act of congress, (which has been declared unconstitutional since the case now under consideration was submitted for decision,) it appears that their so-called trade-mark was in fact, more strictly speaking, only a label.

In *McLean* v. *Fleming* the complainants for many years had been selling preparations labelled "Dr. C. McLane's Liver Pills," and had put up the pills in wooden boxes of uniform size, shape and appearance, with the name of the original inventor stamped in red wax upon the cover of each box, around which they placed a label or wrapper printed in a distinctive style. About 1855 they adopted a black label with white lettering. The defendant, whose name was J. H. McLean, and who had also for many years been making and vending the same kind of pills in boxes similar to complainants', also adopted a black label with white lettering, very similar to complainants', on which he put the words "Dr. J. H. McLean's Universal Pills or Vegetable Liver Pills." It did not appear that the defendant entered upon the business expecting any advantage from the similarity of names, as the manufacture was begun by both in places far apart, one in Virginia, the other in Kentucky, upwards of twenty years before the filing of the bill.

The supreme court, by Mr. Justice Clifford, delivering its unanimous decision, said: "Positive proof of fraudulent intent is not required when proof of infringement is clear, as the liability of the infringer arises from the fact that he is enabled, through unwarranted use of the trade-mark, to sell a simulated article as and for the one which is genuine. Nor is it necessary, in order to give a right to an injunction, that a specific trade-mark should be infringed, but it is sufficient that the court is satisfied that there was an intent on the part of the respondent to palm off his goods as the goods of the complainant, and that he persists in so doing after being requested to desist. Difficulty frequently arises in determining the question of infringement, but it is clear that exact similarity is not required, as that requirement would always enable the wrong-doer to evade responsibility for his wrongful acts. Colorable imitation, which requires careful inspection to distinguish the spurious trade-mark from the genuine, is sufficient to maintain the issue; but courts of equity will not interfere when ordinary attention by the purchaser would enable him at once to discriminate the one from the other. Where the similarity is sufficient to convey a false impression to the public mind, and is of a character to mislead and deceive the ordinary purchaser, in the exercise of ordinary care and caution in such matters, it is sufficient to give the injured party a right of redress if he has been guilty of no laches. Argument to show that the name of the pills, as given in the trade-mark of the respondent, was of a character to mislead and deceive, is scarcely necessary, as they are *idem sonans* in the usual pronunciation; nor can it be doubted that the form of the box containing the pills, and the general appearance of the wrapper which surrounded it, were calculated to have the same effect. Mention may also be made of the fact that the color of the label and the wax impression on the top of the box are well suited to divert the attention of the unsuspecting buyer from any critical examination of the prepared article. Chancery protects trade-marks upon the ground that a party shall not be permitted

to sell his own goods as the goods of another, and, therefore, he will not be allowed to use the names, marks, letters or other *indicia* of another, by which he may palm off his own goods to purchasers as the manufacture of another. Difference between the exhibits undoubtedly exists, still it is manifest that the general appearance of the package, in the respects mentioned, and others which might be suggested, is well calculated to mislead and deceive the unwary, and all others who purchase the article without opening the box and examining the label."

The decree of the circuit court was affirmed, enjoining the respondent from using his own name upon any label or wrapper for boxes or packages of pills resembling or in imitation of the labels or wrappers or trade-mark of the complainant, whether in style of engraving, printing or lettering, but the decree for account was reversed upon the ground of inexcusable laches and delay in filing the bill.

We have come to the conclusion in the case before us that the respondent should be enjoined from putting up his goods in the manner in which he has been doing, as shown by the exhibits, or in any other manner so simulating the form, color, labels and appearance given by the complainant to his goods as to mislead purchasers into mistaking one for the other.

What we decide is that whether the complainant has a trade-mark or not, as he was the first to put up bluing for sale in the peculiarly shaped and labeled boxes adopted by him, and as his goods have become known to purchasers, and are bought as the goods of the complainant by reason of their peculiar shape, color and label, no person has the right to use the complainant's form of package, color or label, or any imitation thereof, in such manner as to mislead purchasers into buying his goods for those of the complainant, whether they be better or worse in quality. And finding, from the exhibits and proof in the cause, that the bluing put up by the respondent is not only well calculated so to mislead purchasers, but has actually done so, to the injury of the com-

plainant, we are of opinion that respondent should be perpetually enjoined, and that he should account to the complainant for the damages sustained by him.