INTERSTATE DISTILLERIES, INC., ET AL. *v.* SHERWOOD DISTILLING & DISTRIBUTING COMPANY, ET AL.

[No. 23, October Term, 1937.]

174

*Decided December 8th, 1937.*

The cause was argued before BOND, C, J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Vernon Cook* and *Eugene Frederick,* for the appellants.

*J. Craig McLanahan* and *Kenneth C. Proctor,* with

whom were *Melvin D. Hildreth* and *France, McLanahan & Rouzer* on the brief, for the appellees.

BOND, C. J. delivered the opinion of the Court.

The contest in the case is one over the use of the name and trade-mark of the former manufacturers of Sherwood Whiskey. In the year 1924, while the Eighteenth Amendment to the Federal Constitution and the Act of Congress (National Prohibition Act, 27 U. S. Code Ann. sec. 1 *et seq.*) prohibiting the manufacture and sale of whiskey for beverage purposes were in force, Louis Mann bought all the whiskey distilled and owned by the Sherwood Distilling Company, an old corporation, and acquired the right to use in the resale of it the name and identifying mark used on that whiskey since 1890. The original company then discontinued all business, its plant was dismantled, and its land sold, and ultimately its charter was forfeited under the laws of Maryland for nonpayment of taxes. Code, art. 81, sec. 103. Mann subsequently caused a Sherwood Distilling & Distributing Company to be incorporated for the disposal of the whiskey purchased, and as the stock diminished that corporation extended the business, and the use of the mark and name, to other whiskey of a variety of kinds and origins, and has since, to some extent, sold gin, brandy, and rum, under the Sherwood name and mark. Some time after the repeal of the Prohibition Amendment in 1933, the appellants, more particularly Haim, claiming succession to the right and title of the original Sherwood Company by virtue of ownership of all its capital stock, started to put on the market a rye whiskey under the same name and mark; and the appellees, denying the succession, and asserting, first, ownership by transfer to themselves, and, then, by amendment, asserting that there had been an abandonment of the mark and name by the original company, throwing them open to their appropriation, were granted an injunction to restrain the threatened use. The defendants and appellants, in addition to making claim to the right of the original company,

urge that, whatever their own right or lack of right, the complainants are guilty of fraud in some misstatements of ownership, and in the promiscuous, misleading use of the name and mark, and are not entitled to the protection of a court of equity in it.

The whiskey had been manufactured by members of a Wight family at Cockeysville, Baltimore County, since 1868. It was known as a straight rye, or a pure rye and malt whiskey, and was distilled upon a secret formula from a mixture of grains at least eighty per cent. of which were rye, had some advantages from water at the site, was one of the best, possibly the best, of rye whiskies in the country, and the highest priced; and it was sold in large quantities. The distillery was the largest in the state. In 1882, the owners were incorporated under the name of Sherwood Distilling Company, and in 1890 the distinctive trade-mark was adopted. It need not be described here in detail, for the labels subsequently used continued the distinguishing features of the original ones, and despite some differences would all, in the opinion of the court, certainly strike ordinary observers as the same. Only close examination would have given notice of words altered or inserted. We understand it to be conceded, indeed, that if the right to use the original mark remained in another, the labels subsequently used by the appellees would constitute an infringement, and there would be a case for an injunction to restrain it. The mark was registered by the original company in 1913.

Distilling was stopped, and, as it proved, finally stopped, under orders of the federal government in 1917, during the war; the industry being classed as a nonessential one. Three years later, in 1920, national prohibition intervened. Harry B. Wolf, of Baltimore, acting for clients, bought from the Wights a majority of the capital stock of the company, and Haim testifies that he acquired first that majority, and later the remaining capital stock outstanding, so that he became the sole owner of all of it. Under the new ownership the sale of the whiskey was continued until 1924, to supply the demand

for medicinal liquor. The whole of the whiskey remaining was, however, concentrated in a warehouse under governmental supervision, and the new owners then made the sale to Louis Mann of all they owned, specifying it in a list of barrels, and with the sale gave the privilege of using on the whiskey the Sherwood name and mark, as stated.

With the purpose of facilitating Mann's sales under an existing federal permit to the original company, the shares of stock of that company were placed in escrow, new directors were elected, and the books and records were turned over to them. But litigation by a creditor interfering, this supplemental arrangement was abandoned, and the shares were returned. The books and records, except the stock book, were returned in 1926.

The directors of the original company held their last meeting on December 11th, 1924. And shortly after the sale of the whiskey, the distillery and warehouse at Cockeysville were dismantled, and the equipment sold; and the land was sold in 1926. It was in 1927 that the charter of the original company was forfeited for failure to pay taxes. Reports to the State Tax Commission by a former officer, in 1925, 1926, and 1927, declared that the business had been discontinued.

In 1924, Mann formed his new corporation, the Sherwood Distilling & Distributing Company, to dispose of his whiskey. And under that name registration of the trade-mark was applied for and obtained, upon representations that the new company was the owner, and that the mark had been used by it and by its predecessor from whom it derived its title for ten years next preceding February 20th, 1905. The expansion of the business and use of the marks began then, whiskey of any kind, purchased from any source, some of it distilled mainly from corn, being sold under the same name and mark, with the addition of the word "Brand," in small type, to the name Sherwood, in conformity with a requirement of the Federal Prohibition Bureau.

Upon the repeal of prohibition, in 1933, the new com-

pany had the trade-mark registration to the original company renewed in the new company's name. In 1934, another new corporation, a Sherwood Distillery Company, was formed by Mann under the laws of Delaware for distilling whiskey to be distributed by his Distilling & Distributing Company, and the Delaware corporation has now, beginning shortly after the institution of this suit, large distilleries in operation. Mann testifies that it produces a whiskey made from the secret formula of the original company, a copy of which was found in the books turned over to Mann in 1924.

The defendant and appellant Haim, who testifies that he became the actual owner of the capital stock of the original company, does not appear after 1924 in the records of the company introduced in evidence, and others do appear as the owners. There is evidence of a claim of ownership of all the stock in a Nathan Curson, one who appears as president of the company. The stock book was not produced in evidence, nor was summons issued for those who may have had it. Haim testifies, however, that he placed the stock in the names of others, who were his agents, and that the certificates were all indorsed for transfer to him as might be needed. Apparently, then, he is not a stockholder of record, and is not one of the directors who might be trustees of the remaining assets on dissolution. Code, art. 23, sec. 92; American-Stewart Distillery v. Distilling Co., 168 Md. 212, 220, 177 A. 473.

An act of the Maryland Assembly, Laws 1931, ch. 381, having provided the necessary extension of time for revival of forfeited charters, Haim, after engaging in the sale of other whiskies, took up with Mr. Wolf in 1933 a question of revival of the old Sherwood charter. This brought on a conference with Mann's attorney, in which Mr. Wolf threatened resistance to the continued use of the name and mark by Mann's company. No action was taken by Haim, however, until 1935, when his attorney submitted to the State Tax Commission articles for the revival. These were withdrawn for amendment, and the

name Sherwood Company, Inc., was reserved for Haim's use until January of 1936. In September, 1936, shortly before the hearing of this case below, after some months of inaction, the amended articles for revival were submitted to the commission, and October, 1936, the franchise taxes were paid for the years intervening since the last previous payment. But the revival was never completed. Haim, in 1935, began selling whiskey under the old Sherwood label, or a label substantially the same, bearing the words, "Bottled by Interstate Distilleries Inc. Baltimore, Md." The whiskey was distributed through three other corporations; one of them a company controlled by Haim in New York. The complainants' bill for an injunction followed.

There is an obvious difficulty in adjudging Haim to be the owner of the capital stock of the original company, for his testimony stands alone to dispose of the possibilities of which warning is given in statements of ownership in others not heard, and the uncertainties of evidence in records and testimony not produced. But the question need not be adjudicated; nor need consideration be given now to the position of a mere stockholder without a corporation. Code, art. 23, sec. 95.

Abandonment of the business, and even of corporate existence, is, of course, abandonment of a right to use the name and mark for the product, at least while the situation continues unchanged. Coupling of the abandonment in this instance with an arrangement to continue identification of the whiskey by the name and mark in sales during an indefinite future complicates the question of right of resumption, for it is agreed that abandonment under compulsion may not foreclose a right to resume when the compulsion is lifted. *Poiret v. Jules, Poiret Ltd.*, 37 R. P. C. Ch. Div. [1920] 177; *Baglin v. Cusenier Co.*, 221 U. S. 580, 31 S. Ct. 669, 55 L. Ed. 863; *Rey v. Lecouturier*, [1908] 2 Ch. 715. And see study of *"Liquor Trade Marks since Repeal,"* 2 Geo. Washington Law Review, 419, 430; *Nims, Unfair Competition, etc.* (3rd Ed.) 1017. But because of the possibility of un-

heard claimants to the capital stock of the old Sherwood Company, as well as because of an absence of necessity for it, the court does not decide in this case the question of conclusive abandonment by that company. The conclusion reached on the complainant's right to appropriate the name and mark to the uses now made decides the case.

Objection has been made that the complainants disqualified themselves for receiving the aid they ask from a court of equity, whatever their right be otherwise, because of their past representations to the agencies of the federal government, in applications for registration of the name and mark, that they owned them. But if these were conscious misrepresentations they would constitute past wrongdoing which would not affect the present proceeding. See *Sheeler v. Holt*, 161 Md. 366, 370, 157 A. 195. In *Ford v. Foster*, L. R. 7 Ch. App. 611, a misrepresentation that the complainant was a patentee did not prevent the assertion of rights.

But if it be assumed that there was a complete abandonment by the old company of the name and mark of the original Sherwood Whiskey, subject to the arrangement for continuation of them as identifying marks in future sales, does that fact alone answer the question of the right of an appropriator to put out other whiskey under the marks? To suggest an extreme case: If the marks had declared conspicuously, and in words, that the whiskey in the container was made by the original Sherwood Distilling Company, should an abandonment of the marks, along with existence as a corporation, empower an appropriator to put out other whiskey under that declaration, and claim the protection of the court in it? A trade name or mark is a declaration of origin and quality to the extent that associative significance has been built up for it in a business career. The complainants contend that an abandonment does leave the name and mark open to appropriation and use without regard to deception of the public as a consequence of continuation of the old association. But in that conclusion the court has not agreed. There would seem to

be no more reason for protecting deception by appropriation of an old mark than for protecting it when resulting from a direct misstatement of fact. *Siegert v. Abbott,* 61 Md. 276; *Kenny v. Gillet,* 70 Md. 574, 17 A. 499; *Stonebraker v. Stonebraker,* 33 Md. 252; *Manhattan Medicine Co. v. Wood,* 108 U. S. 218, 2 S. Ct. 436, 27 L. Ed. 706. And if this is true, an abandonment of a name and mark does not render them open to use on another product until their special meaning to the public is lost, at least not unless there should be in the labels some adequate notification of the change. In *Ford v. Foster,* L. R. 7 Ch. App. 611, Mellish, L. J., said: "Then what is the test by which a decision is to be arrived at whether a word which was originally a trade mark has become *publici juris*? I think the test must be, whether the use of it by other persons is still calculated to deceive the public, whether it may still have the effect of inducing the public to buy goods not made by the original owner of the trade mark as if they were his goods." And in one of the several studies of trade-mark rights in volume 30 of the Columbia Law Review, a writer on the effect of abandonment observes, page 697; "The soundest of the decisions lay the groundwork for two constructive rules, * * * (II) The survival of the associative significance of a mark measures the period during which the mark cannot be appropriated by another." *Nims, Unfair Competition, etc.* (3rd Ed.) secs. 390, 391, and 392.

There seem to be few cases announcing the principle in these terms, but it is the principle applied in the numerous cases in which it has been held that even when the right to a name and mark has been transferred, but without transfer of the old business with which they had been associated, they cannot be used in such a way as to continue the association for the new altered use. "The mere sale of a trade-mark apart from the article to which it is affixed, confers no right of ownership, because no one can claim the right to sell his goods as manufactured by another. To permit this to be done,

would be a fraud upon the public." *Witthaus v. Braun,* 44 Md. 303, 306; *Wilmer v. Thomas,* 74 Md. 485, 22 A. 403. "The public has a right to know the origin of goods and commodities which it purchases. The public comes to recognize commodities designated by a particular mark as the product of a certain dealer, and as containing certain characteristics and qualities. If the owner of a mark be permitted to sell it, unaccompanied by the business by which it has become known to the trade, for use on goods of the same general class, but possessing different characteristics and qualities, one of the purposes of the law has failed and a fraud upon the public sanctioned." *Mayer Fertilizer Co. v. Virginia-Carolina Chem. Co.,* 35 App. D. C. 425, 428; *Mulhens & Kropff v. Muelhens, Inc.* (C. C. A.) 43 Fed. (2nd) 937, 939; *Powell v. Valentine,* 106 Kan. 645, 648, 189 P. 163; *Lemoine v. Gauton,* 2 E. D. Smith (N. Y.) 343; *Independent Baking Powder Co. v. Boorman* (C. C.) 175 Fed. 448, 455.

Here the complainants' use started with a marking identifying, and truthfully identifying, the purchased whiskey as that of the original corporation; and that identification was kept up with the sale of the original whiskey until shortly before the suit. The old labels were continued unchanged on that whiskey. And in the subsequent use on other goods variations in the labels appear avoided, as far as possible, in a studied effort to continue the associative significance for the changed goods. In 1928, when it was considered desirable to meet the demand for medicinal whiskey, and the complainants, as supposed owners of the name and mark, extended the use to a variety of liquors, they substituted the word "Brand" in small pica type on a barrel head in the label, in the place of the old word "Pure," or above the barrel and surrounding scroll. Labels in comparatively small type on the backs of the bottles stated the names of distilleries, but this would be rendered ineffectual as a notice by the continuation on the front of the distinctive mark with the same barrel, the same

scroll, the same heavily shaded script of the word "Sherwood" over all, and the same old English type underneath the barrel and scroll for the name Sherwood Distributing & Distilling Company, and, added to these, some outline type of the same size, all to present the same picture substantially. At the top of some of the labels a statement of age of the whiskey, such as "17 Years Old," was placed, and the natural effect was left to correction by the appearance on the back label of the name of a distiller other than that of the Sherwood Distilling Company. It was not Sherwood Whiskey as known to the trade. The impression among many buyers that the old make of whiskey is being continued seems certain to follow. The facts speak for themselves. *Katz Co. v. Corticelli Silk Co.,* 58 App. D. C. 286, 29 Fed. (2nd) 874.

In the opinion of the court, the complainants cannot be protected in their use, and their bill must be dismissed.

> *Decree reversed, and bill dismissed, with costs.*

PARKE, J., dissents.