SHERWOOD COMPANY, INCORPORATED, *v.* SHERWOOD DISTILLING COMPANY ET AL.

STANDARD DISTILLERS PRODUCTS, INCORPORATED, ET AL. *v.* SHERWOOD DISTILLING COMPANY

[Nos. 9, 10, October Term, 1939.]

456

*Decided December 27th, 1939.*

458

The causes were argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Vernon Cook* and *Eugene Frederick,* with whom was *I. Wm. Schimmel* on the brief, for appellants in both cases.

*William Lee Rawls* and *Kenneth C. Proctor,* with whom were *Melvin D. Hildreth* and *France, Rouzer & Lentz* on the brief, for the appellees in both cases.

DELAPLAINE, J., delivered the opinion of the Court.

The problem in these cases is to determine the owner of the trade-name and the trade-marks of "Sherwood Whiskey." The question has appeared in this court before, but it was not finally decided. *Interstate Distilleries v. Sherwood Distilling & Distributing Co.,* 173 Md. 173, 195 A. 387.

The Sherwood Distilling Company, which commenced the distillation of whiskey at Cockeysville in 1868, was incorporated under the laws of Maryland in 1882. It began the use of trade-marks in 1890 and registered them in the Patent Office in 1913.

In 1917 the Federal Government ordered distillation stopped as a war measure. In 1920 Prohibition took

effect. In 1921, when it was illegal to sell whiskey except for medicinal purposes, the controlling interest in the corporation was purchased by Irving Haim, and in 1923 the remaining interest was acquired by him.

In 1923 the Government ordered the corporation to remove its entire stock of whiskey to the concentration warehouse in Baltimore. In 1924, on account of the loss of revenue from storage, Haim resigned as treasurer and general manager and made plans to sell the remaining supply of whiskey and to leave the state. Harry B. Wolf, acting for Haim and his associates, found a purchaser, Louis Mann. On June 28th, 1924, the corporation, through Nathan Curson, president, sold the whiskey to Mann for $150,000. Mann received the right to use the name and trade-marks which had been used on the whiskey. It was planned to place the stock certificates in escrow for a period of not more than five years to facilitate the marketing of the whiskey; but the plan was abandoned. The surviving escrow agent testified that he had never received any stock certificates.

Following the appointment of receivers for the corporation, its plant at Cockeysville was dismantled, its land was sold, and its charter was subsequently forfeited for non-payment of taxes. Mann had formed a new corporation, the Sherwood Distilling and Distributing Company, for the purpose of continuing his sales. This corporation maintained an office in Baltimore City, sold under the "Sherwood" name and marks, and, after the old corporation had become defunct, applied for registrations of the trade-marks. Mann claimed the right to use the trade-marks by virtue of his purchase of the remaining supply of whiskey from the old corporation; and in 1933 the Patent Office, finding no objection to renewal of the trade-marks, registered them in the name of the Sherwood Distilling and Distributing Company.

At repeal of Prohibition in 1933, Haim conferred with Harry B. Wolf regarding the possibility of reviving the old Sherwood charter. In 1935 articles for revival were submitted to the State Tax Commission; in 1936 amended

articles were submitted. But the revival was never consummated.

Mann also formed the Sherwood Distillery Company, Inc., under the laws of Delaware, for the purpose of distilling whiskey to be distributed by his Maryland corporation. For several years after repeal, the Delaware corporation distilled whiskey under an agreement with the Baltimore Pure Rye Distilling Company. But in 1935 the corporation started to build a distillery at Westminster, and in 1936 the distillery was completed at a cost of about $260,000. In 1937 the name of Mann's Maryland corporation was changed to the Sherwood Distilling Company. During the year 1937 proceeds from the sale of whiskey aggregated $650,000.

At common law the rights of owners of trade-marks have been repeatedly recognized, regardless of registration laws. A certificate of registration is not conclusive of the validity of a trade-mark; and the existence or absence of registration does not affect the jurisdiction of the courts to determine the validity of acts of appropriation. *Bisceglia Bros. Corporation v. Fruit Industries, D. C.,* 20 Fed. Supp. 564.

The appellants contend that the original Sherwood Distilling Company retained its trade-name and trade-marks. But there is no evidence to sustain this contention. Curson, notwithstanding that he had knowledge of the formation of Mann's corporation, made no protest against the use of "Sherwood" in the corporate name. Haim, in testifying about his desire to sell and to leave the state, asserted: "Prohibition by that time looked like it was here to stay. The future looked extremely dark and doubtful. * * * I then * * * turned my accounts and everything over and my books to Mr. Harry B. Wolf, * * * and I forgot my mistake in getting into the whiskey business."

Wolf testified that when the whiskey was bought by Mann, the stockholders abandoned everything. Referring to the abandonment by the stockholders, he said: "They had abandoned it and did not want it. It was no

good. They were glad to get rid of it. It was an elephant and headache. The United States Government required all the distillers to concentrate the whiskey in concentration warehouses, and as soon as that took place they were frantic to get rid of it." Wolf declared that the stock certificates were "considered of no value to anybody," and the stockholders were "so happy to get rid of them" that he did not know what became of them.

It is well recognized that property is considered as abandoned when the owner walks off and leaves it with no intention of claiming it again or exercising rights of ownership over it; and when this is done, it belongs to any one who takes possession of it. *Steinbraker v. Crouse*, 169 Md. 453, 182 A. 448. So, when the owner of a trade-mark discontinues business and abandons the trade-mark, it is opened to the public and subject to appropriation by any one. When two or more persons use the same trade-mark, the person who first affixes the designation to goods as his trade-mark, and so sells them, is entitled to its exclusive use. *A. L. Inst., 3 Restatement of Torts*, 568. When a person appropriates a trade-mark, although not the legal successor of the firm which had been the original user of it, his right dates from the time of his own use of it. *Deitsch v. George R. Gibson Co.*, 155 Fed. 383. The question whether a trade-mark, like other property, has been abandoned, depends upon intention. Such intention, however, may be inferred from circumstances which point to an intention to abandon. *Nims on Unfair Competition and Trade-Marks*, sec. 408; *Corkran, Hill & Co. v. A. H. Kuhlemann Co.*, 136 Md. 525, 111 A. 471.

But non-user, in the absence of intention to abandon, does not destroy trade-mark rights, unless the trade-mark has ceased to be distinctive or has become identified with other goods. *Corkran, Hill & Co. v. A. H. Kuhlemann Co., supra.* So, where suspension of the use of a trade-mark on candy was caused by scarcity of sugar during the war, the court held that there was no abandonment of the trade-mark, where the manufacturer had not gone

out of business, but had retained the seals and had resumed the use of the trade-mark after the war. *Universal Candy Co. v. A. G. Morse Co.,* 54 App. D. C. 388, 298 Fed. 847. Likewise, the disuse of a trade-mark due to a statutory prohibition of the sale of liquor is not in itself an abandonment. *Olympia Brewing Co. v. Northwest Brewing Co.,* 178 Wash. 533, 35 P. 2nd 104; *Bisceglia Bros. Corporation v. Fruit Industries, supra.*

But the acquiescence of an original proprietor of a trade-mark in the use of it by another is evidence of an abandonment. If the owner of a trade-mark stands by and allows others to use it under such circumstances that his continued attitude of non-interference may reasonably be inferred, he can not cause others, who have acted upon the strength of his silence and inaction, to lose the result of their work and the money they have expended. *Nims,* secs. 416, 417. Non-user of a trade-mark by the original owner, together with an extensive use of it by any one else, constitutes abandonment, and confers upon the appropriator the exclusive right to it. In *Tygert-Allen Fertilizer Co. v. J. F. Tygert Co.,* 191 Pa. 336, 43 A. 224, wherein the complainant stood by for two years and a half without making any objection, while the defendant expended large sums of money and built up a business depending upon the use of a trade-name, the court held that the delay of the first corporation to restrain the use of the trade-name showed such laches and intent to abandon as to defeat an application for an injunction to retrain such use by the second corporation. The failure of a claimant to assert his rights, and his disregard of an extensive use of a trade-mark, while a large and valuable competitive business grows up about it, are proof of an intent to abandon; and where new rights have arisen as a result of such adverse use, it would be inequitable to restrain subsequent users. *Bisceglia Bros. Corporation v. Fruit Industries, supra.*

The appellants cited the opinion in the case of the Carthusian Monks, wherein the Supreme Court of the United States held they were entitled to an injunction to

prevent the infringement of their trade-marks. For several hundred years the monks had been making a liqueur known as "Chartreuse" at the Monastery of La Grande Chartreuse in France. When the congregation was ordered dissolved by a French court, the monks moved to Spain and established a new plant to make the liqueur under their secret formula. The French liquidator thereupon planned to make a cordial resembling "Chartreuse," and to give to the Cusenier Company the right to sell it in the United States. When this company announced it for sale, the monks, who had registered their trade-marks in the United States many years before, applied for an injunction. Justice Hughes, in delivering the opinion of the Supreme Court, declared: "The attitude of the monks in their efforts here and in other countries to prevent the use of the old marks shows clearly that there has been no intention to abandon. It was natural enough that the monks, unable to use their former marks in France, should desire to bring into use a designation which could be available there as well as in other countries. But this is far from indicating the slightest disposition to surrender to the world the right to denominate liqueurs by the ancient name and symbols taken from their own order." The court also observed that, as soon as the liquidator announced his plan to put "Chartreuse" on the American market, the monks promptly asserted their rights. *Baglin v. Cusenier Co.*, 221 U. S. 580, 31 S. Ct. 669, 674, 55 L. Ed. 863.

But in the proceedings now before us, the evidence shows that Haim and his associates intended to abandon, and did abandon, the use of the "Sherwood" trade-name and trade-marks at the time of the sale to Mann in 1924. They relinquished their interest in the whiskey business, and acquiesced in Mann's use of the name and marks not only during Prohibition but also for two years thereafter. The chancellor, after hearing the testimony, concluded that Haim's purpose in acquiring the old Sherwood corporation was merely "to liquidate the whiskey stock, collect the warehousing charges, sell the real estate, quit

and close out as soon as possible." For inasmuch as the Eighteenth Amendment to the Federal Constitution became effective in 1920, the only part of the liquor business which Haim could legally conduct after he acquired the majority interest in 1921 was the sale of whiskey for medicinal purposes and the collection of storage charges. It was not until 1935, two years after the repeal of Prohibition, that Haim made an attempt to sell any whiskey under the "Sherwood" name. In that year he sold 150 cases of whiskey. But Mann alleged that Haim fraudulently used the name of the Sherwood Company, Inc., when no such corporation then actually existed.

On hearing of the sales of Haim, Mann, who had used the "Sherwood" name and trade-marks without objection for a period of twelve years, asked for an injunction; but this court, without deciding the question of abandonment of the "Sherwood" name and marks, denied the injunction because the Mann group had failed to notify the public that their whiskey was not the "Sherwood" distilled at Cockeysville, inasmuch as an abandonment of trade-marks does not render them open to use on another product "until their special meaning to the public is lost, at least not unless there should be in the labels some adequate notification of the change." *Interstate Distilleries v. Sherwood Distilling & Distributing Co.*, 173 Md. 173, 181, 195 A. 387, 390.

Haim complains that Mann's corporation perpetrated a fraud by selling imitations. As the stock of whiskey diminished, the corporation extended the use of the name and mark to whiskeys produced at other distilleries. But each bottle bore a "Brand" label showing that the whiskey was of "bonded" age, over four years old. Mann declared that both the face label and the green stamp on the neck of the bottle contained the name of the distillery, in compliance with the requirements of the Federal Prohibition Bureau. Mann also testified that the corporation commenced to sell straight rye whiskey as soon as its manufacture was legalized by repeal of Prohibition. The distillery at Westminster has used the three-chamber

process with a basic formula for Maryland rye whiskey virtually identical to the formula which had been used in the distillery in Cockeysville.

If Mann and his associates had any design to defraud the public, the only possibility of deception came from the continuance of the use of the name and trade-marks with the result that buyers might have thought they were buying whiskey which had been made at Cockeysville. But after the decision of the Court of Appeals in the *Interstate Distilleries* case, the Mann corporation promptly placed on the face labels on all it bottles of whiskey this notice: "not distilled by the original Sherwood Distilling Company, of Cockeysville, Maryland." Mann now contends that, if his corporation ever had "unclean hands," it was fully purged itself. With this contention we agree. The maxim that he who comes into equity must come with clean hands has nothing to do with retribution or punishment, or with disapproval of the character or past behavior of the applicant, but only with the effect of his present application. Consequently, when there has been a question of the propriety of conduct of an applicant in the past, but the applicant has corrected any alleged mistake and complied with the suggestions of the court, his impropriety should be considered as closed and should not debar him from relief. *Baltimore Humane Impartial Society v. Marley,* 156 Md. 478, 144 A. 521; *Sheeler v. Holt,* 161 Md. 366, 157 A. 195. It has been held that even the fact that the manufacturer of an article had built up its business partly on actual misrepresentations made upon its labels and wrappers and in its advertisements should not debar it from relief in equity against unlawful imitation of its trade-name, where it has discontinued such misrepresentations. *Moxie Nerve Food Co. v. Modox Co.,* 153 Fed. 487.

Since the labels on the "Sherwood" bottles have been plainly marked, so there can be no chance that the public might now be misled to believe that the whiskey made at Westminster might have been made at Cockysville, we hold that the decree of the Circuit Court of Baltimore

City, dismissing the bill of complaint for an injunction to restrain Mann and his corporations from the use of the "Sherwood" trade-name and trade-marks, should be affirmed.

The second appeal is from a decree granting an injunction to Mann's corporation, Sherwood Distilling Company, restraining the Standard Distilleries, Products, Inc., and other parties involved, from selling under the "Sherwood" name and marks. The bill was dismissed as to Charles Haim because the testimony did not show any ground for relief against him. It appears that the Sherwood Company, Inc., Irving Haim's company, had attempted to grant to the Standard company an exclusive license to use the "Sherwood" name and marks. This decree likewise should be affirmed.

*Decrees affirmed, with costs*