### GREYHOUND CORPORATION et al. v. ROTHMAN et al.
### Civil Action No. 4083.

United States District Court
D. Maryland.
April 8, 1949.

Joseph R. Byrnes and David P. Gordon, both of Baltimore, Md., for plaintiffs.

Nathan Hamburger, of Baltimore, Md., for defendants.

COLEMAN, Chief Judge.

This is a case of alleged infringement of a trade name and trade symbol, and also of unfair competition. The plaintiffs, the Greyhound Corporation and its affiliate, Pennsylvania Greyhound Lines, Inc., ask that the three defendants, doing business under a partnership known as the Greyhound Cab Co., be permanently restrained from using the trade-name "Greyhound" and the figure of a running greyhound dog as a symbol on their taxicabs in Baltimore.

Most of the material facts in the case have been stipulated by the parties. The plaintiffs conduct a nationwide passenger motor bus service. One of them, the Greyhound Corporation, incorporated in Delaware, with principal offices in Chicago, has been engaged since 1926 in passenger motor bus service, both directly and through ownership or management of twenty-three subsidiary and affiliate corporations, including the other plaintiff in this suit, namely, Pennsylvania Greyhound Lines, Inc., which is also a Delaware corporation with principal offices in Cleveland, Ohio. This latter company has been in existence since 1930. It was originally formed to carry out an arrangement between the Greyhound Corporation and the Pennsylvania Railroad whereby the former's motor bus lines operating in the territory served by the Railroad became merged under the management of the Greyhound Corporation, which, with its various subsidiary and affiliate corporations including the other plaintiff, Pennsylvania Greyhound Lines Inc., has always been managed and operated as a single,

continuous system of motor bus transportation, known as the Greyhound System. It first afforded service to and from Baltimore in 1928, and for many years past has served virtually the entire United States. Since the establishment of the Greyhound System travelers have been able to purchase tickets at any point served by the System, for transportation to any other point served. It operates its own terminals. From 1928 to 1934, it rented terminal facilities in Baltimore but since 1934, it has operated its own terminals there.

Shortly after its formation in 1926, the Greyhound Corporation acquired, through stock ownership, the Safety Motor Coach Lines, Inc., a Michigan corporation operating passenger motor bus service between Chicago and Muskegon, Michigan. For two years prior thereto, that is, since 1924, all the buses operated by this Michigan Company which called itself the Greyhound Line, were painted blue and white, and they displayed the name "Greyhound" and the figure of a running greyhound dog. Thereafter, as the Greyhound Corporation acquired or organized and managed other subsidiary or affiliate companies, it required all of them to use the name "Greyhound" and the dog symbol on their buses, terminals, lunchrooms and related facilities, drivers' uniforms, tickets, stationery, schedules, advertising, etc., in a uniform manner. All buses operated by the Greyhound System have always been substantially uniform as to type and also color, i. e., blue and white.

In May, 1928, the Greyhound System initiated through service between Baltimore, Pittsburgh, Cleveland and other points west, via the Blue Ridge Transportation Company which previously had operated as an independent line between Baltimore and other points in Maryland and also some in Pennsylvania. As early as July, 1928, the Greyhound System advertised this service in the Baltimore press, and in October, 1928, the Greyhound Corporation, through a wholly owned subsidiary, Greyhound Lines, Inc., an Indiana corporation, inaugurated its own direct service between Baltimore, Washington and Pittsburgh via Gettysburg. Thereafter, up to the present time, the Grey-

hound Corporation, through the Greyhound Lines, Inc., and the latter's successor, the Pennsylvania Greyhound Lines, Inc., that is, the other plaintiff in the present suit, has, without interruption, maintained this same service to and from Baltimore which, with the growth of traffic, has increased from two arrivals and departures a day in October, 1928, to 106 a day at the present time.

The first appearance of the name "Greyhound" and the running dog symbol on or in connection with any transportation in Baltimore other than that afforded by the Greyhound System, occurred in the year 1932 when one Ralph Adelman, who was then operating four taxicabs in the city, adopted this name and insignia as a result of having seen them on a Greyhound bus. Adelman used both name and figure until December 31, 1933, when he discontinued his taxicab business, upon refusal of the Public Service Commission of Maryland to renew his permit. On January 15, 1934, he gave to one William H. Rothman, one of the defendants in the present case, who, with the other defendants as partners was organizing the Greyhound Cab, Inc., a written authorization "to use the name Greyhound in connection with the title of the corporation you are to form for the taxicab business." No consideration was given Adelman for this permission. On January 16, 1934, the present defendants incorporated the Greyhound Cab Inc. under the Maryland law, and shortly thereafter began to operate twenty-three taxicabs in Baltimore under permits from the Public Service Commission, prominently displaying the name "Greyhound" and the running dog figure on the sides of these taxicabs. These three individual defendants had previously been separately engaged in the taxicab business in Baltimore under the respective trade names of University Cab Co., Peerless Cabs, and Mt. Royal Cab Co., Inc.

Some time in the early part of the year 1940 officials of the plaintiff companies first learned of this use of the name "Greyhound" and the running dog symbol by the Greyhound Cab Inc. and through their counsel, requested that this practice be stopped. By this time the business of the

Greyhound Cab Inc. had materially increased and it was operating approximately seventy-five taxicabs in Baltimore.

In February, 1941, the present plaintiffs being unsuccessful in their endeavor to get the Greyhound Cab, Inc., voluntarily to stop using the name "Greyhound" and the running dog symbol, filed suit in this Court asking for an injunction against the Greyhound Cab, Inc. While this suit was pending, that is, on April 1, 1941, the cabs of the Greyhound Cab, Inc., were transferred to a partnership consisting of the three present defendants trading as Greyhound Cab Company. The Maryland Public Service Commission reissued permits to this partnership. Thereupon, the defendants placed their taxicabs under the so-called Diamond Cab Company system, which was an organization in Baltimore of various taxicab owners who operated their cabs jointly as one system but retained title to the individual cabs. The defendants' cabs were repainted to conform to the Diamond colors and scheme of decoration. The figure of the running dog was eliminated from defendants' cabs and a red diamond symbol, with the words "Diamond Cab," appeared conspicuously on their rear doors, although on their front doors where, pursuant to requirement of the Maryland Public Service Commission, the owner's name must be inscribed, the words "Greyhound Cab" did appear but in three-inch black lettering—much smaller than the "Diamond Cab" lettering.

Relying upon the aforegoing, the plaintiffs on January 29, 1942, entered a voluntary dismissal without prejudice of their suit in this Court against the Greyhound Cab, Inc. However, in the Fall of 1943, the defendants, without informing the plaintiffs, withdrew their taxicabs from the Diamond System and continued to operate them directly under their partnership name, Greyhound Cab Co. The cabs were repainted and redecorated to eliminate all reference to the Diamond System. The word "Greyhound" was placed on the sides of the cabs in even larger display lettering than the defendants had used on their cabs before entering the Diamond System, and the figure of the running greyhound dog, illuminated at night, was fea-

tured on the front part of the roof of each taxicab. All of this insignia the defendants have continued to use up to the present time.

In the Summer of 1947 officials of the plaintiffs learned for the first time that defendants had withdrawn from the Diamond System, although some of defendants' cabs had been seen from time to time on the streets of Baltimore with this changed insignia by representatives of plaintiff companies. Plaintiffs thereupon, in the Summer of 1947, made a formal protest through counsel against defendants again using the name "Greyhound" and the running dog symbol. They contend that their reason for this protest being so delayed was primarily the War and the very heavy pressure of emergency service on which they had to concentrate all their attention and efforts. Being unsuccessful with this protest, the present suit was filed by plaintiffs on July 20, 1948.

■ Defendants, in denying the right of the plaintiffs to enjoin them from use of the name "Greyhound" and the running dog symbol, rely primarily upon the defense of abandonment, acquiescence, laches and estoppel in not making timely objection to such use by the defendants. Clearly, if defendants have any sound defense to the plaintiffs' suit it must be upon one or more of these grounds, because there can be no doubt on the stipulated facts and the testimony that the plaintiffs were the first to use the name and symbol in question in Baltimore. Use by the plaintiffs began in the year 1928, whereas the defendants did not begin until 1934, and neither the name nor symbol was used by anyone else in Baltimore except the Greyhound System prior to 1932.

■ It is equally clear that the name "Greyhound" and the running dog are within the class of distinctive trade names and symbols to which a wide range of protection is accorded. The word "Greyhound" undoubtedly acquired a secondary significance. See Greyhound Corporation v. Goberna, 5 Cir., 128 F.2d 806. There, one of the present plaintiffs, the parent Greyhound Corporation, was granted a permanent injunction against the use of

the name "Greyhound" and the running dog symbol by persons engaged in the business of selling Cuban tours. The Fifth Circuit Court of Appeals held that their use by the defendants in that case allowed them to trade upon the reputation and good will of the Greyhound Corporation and its affiliates, which were entitled to a monopoly in their use insofar as the field of transportation was concerned. See also Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629; Triangle Publications v. Rohrlich, 2 Cir., 167 F.2d 969; Stork Restaurant v. Sahati, 9 Cir., 166 F.2d 348; Yellow Cab Transit Co. v. Louisville Taxicab & Transfer Co., 6 Cir., 147 F.2d 407.

The principle has been long and firmly established by many decisions that the absence of competition between prior and later users of a distinctive trade name or symbol is no bar to injunctive relief. See, for example, Reid, Murdock & Co. v. H. P. Coffee Co., 8 Cir., 48 F.2d 817; Yale Electric Corp. v. Robertson, 2 Cir., 26 F. 2d 972; Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 247 F. 407, L.R.A.1918C, 1039.

It is true that the extent of exclusiveness to be accorded a trade name or trade mark varies with their character. If the name or mark is essentially arbitrary, original, or fanciful, it is more peculiarly significant or suggestive of a particular product than when it is frequently used in many different kinds of business. Such words as "Kodak," "Aunt Jemima," "Nujol" are illustrative of the first type. See Aunt Jemima Mills Co. v. Rigney & Co., supra; Standard Oil Co. of New Mexico v. Standard Oil Co. of California, 10 Cir., 56 F.2d 973; Standard Oil Co. v. California Peach and Fig Growers, D.C., 28 F.2d 283. Such words as "Simplex," "Blue Ribbon," "Century," are illustrative of the second type. See American Steel Foundries v. Robertson, 269 U.S. 372, 46 S.Ct. 160, 70 L.Ed. 317; Pabst Brewing Co. v. Decatur Brewing Co., 7 Cir., 284 F. 110; Ph. Schneider Brewing Co. v. Century Distilling Co., 10 Cir., 107 F.2d 699.

This distinction was made by the Court of Appeals for this Circuit in Arrow Distilleries, Inc., v. Globe Brewing Co., 117 F.2d 347. There it was held that the word "Arrow", which was in very common use as a trade mark for various products, belongs to the class whose exclusive field is closely restricted, and hence could be used by one manufacturer for beer and ale, and by another manufacturer for cordials and liqueurs without infringement, in the absence of proof of actual confusion or intent to deceive, especially where marketing territories of the manufacturers were not identical. The Court said, 117 F.2d 347, at pages 349, 351: "The crucial issue in the case is whether the word 'Arrow' is a word of such distinctive character, when adopted as a trade-mark for one kind of intoxicating liquors, that it cannot be used on any other kind without creating the belief that both spring from a common source; or, on the other hand, is a word like 'Standard,' or 'Gold Medal,' or 'Blue Ribbon,' which has been adopted by many persons as a trademark for articles of divers kind that it does not signify the goods of any one user. The question is important because, in determining the extent of the field of exclusive occupation, a name in the first class is accorded liberal treatment in the law of trademarks, while a name in the second class is narrowly restricted to the particular kind of goods for which it is used by its owner.

\*     \*     \*     \*     \*     \*

"It must be conceded that in some of the cited cases the classification of goods has proceeded on very fine lines, and it should be understood that these instances are used to illustrate a principle rather than as examples to be slavishly followed in the future. Moreover, it should be borne in mind that the distinctiveness of a mark is only one of the factors to be taken into account in deciding a question of infringement. Nevertheless the rule that coined or fanciful marks or names should be given a much broader degree of protection than words in common use is sound, for it recognizes not only the orthodox basis of the law of trade-marks that the sale of the goods of one manufacturer or vendor as those of another should be prevented, but also the fact that in modern business the trade-mark performs the added function of an advertising device, whose value may be

injured or destroyed unless protected by the courts."

█ There can be no question that the word "Greyhound" and the running dog symbol are distinctive and fanciful—far more so than the word "Arrow" and there is a total lack of proof in the present case that they have ever been used as designations of any other trade or product. The only suggestion before the Court to this effect is that contained in the Court's opinion in Greyhound Corporation v. Goberna, supra, where reference is made to testimony in that case that the word "Greyhound" is used in Miami, Florida, in connection with dog-racing, and as the name of several business establishments. So, it is clear that Arrow Distilleries Inc., v. Globe Brewing Co., supra, and similar decisions are not controlling in the present case. It is well established that the prior user of a distinctive trade designation is not required to prove actual deception of the public with respect to a non-competing infringer, in order to obtain injunctive relief. It is sufficient if reasonable probability of confusion is proved. See Stork Restaurant v. Sahati, supra; Brooks Bros. v. Brooks Clothing of California, D.C., 60 F.Supp. 442, affirmed 9 Cir., 158 F.2d 798, certiorari denied 331 U. S. 824, 67 S.Ct. 1315, 91 L.Ed. 1840; Acme Chemical Co. v. Dobkin, D.C., 68 F.Supp. 601. In the present case there is definite testimony that on numerous occasions persons using defendants' taxicabs have been under the impression that they were operated by and formed a part of the Greyhound System. That defendants deliberately intended to, and did capitalize on the good will and reputation of the plaintiffs through use of the name "Greyhound" and the running dog symbol is clear beyond any question on the evidence. The defendants' predecessor in the use of both the name and symbol deliberately copied them from a Greyhound bus. When he lost his operating permit, the defendants, who were then individually operating taxicabs under other trade names, gratuitously obtained from him permission to use the Greyhound name and symbol in the year 1934, by which time plaintiffs had developed an extensive business in Baltimore and their name and symbol were well known. As plaintiffs' counsel very accurately put it: "Why did defendants then go to the trouble of forming a corporation with the word "Greyhound" in its title, and cause all their taxicabs to be painted with the Greyhound name and symbol? They were already using three perfectly suitable trade names and an infinity of others was available, but somehow they chose 'Greyhound.' Since their predecessor was himself a trespasser in the use of the name and symbol, his gratuitous license to the defendants gave them nothing. Even if he had had valuable rights, the license would not have been efficacious, for it is well established in Maryland, as elsewhere, that a trade mark or name cannot be assigned or transferred in gross, that is, apart from the business to which it relates. W. G. Reardon Laboratories v. B. & B. Exterminators, D.C., 3 F.Supp. 467; Interstate Distilleries v. Sherwood Distilling & Distributing Co., 173 Md. 173, 195 A. 387; Restatement of the Law of Torts, Vol. III, §§ 755, 756. The defendants then gained nothing by the purported license from Ralph Adelman."

█ The case against defendants is not altered by the fact that they never adopted, for their cabs, the blue and white coloring of the Greyhound buses. Doubtless, deception or confusion in the public mind would have been greater had defendants done so. But infringement need not embrace complete simulation before the law can intervene.

We thus come to a consideration of the primary argument of the defendants, which is that even if the plaintiffs be found to have acquired, through prior use of the Greyhound name and symbol, the right to exclude the defendants from using them, they nevertheless have lost this right by abandonment, laches, acquiescence and estoppel.

In order to determine whether there is any merit in this contention it is necessary to divide plaintiffs' user into three separate periods: First, the period from 1932—when the name "Greyhound" and the running dog symbol were first used in Baltimore by other than the Greyhound System, i.e., by Ralph Adelman who, two years later, purported to assign this name and symbol to

William H. Rothman, one of the defendants —until 1940 when the plaintiffs for the first time learned that the defendants were using both name and symbol in their taxicab business in Baltimore; second, the period from 1940 to 1943 when defendants withdrew from the Diamond System; and third, the period from 1943 to 1947 when plaintiffs formally requested defendants to desist from using the Greyhound name and symbol, asserting this was an infringement of their own exclusive right to same.

As to the first period, it is of course true that trade name and trademark rights, like other rights that are based upon user, may be lost by abandonment, laches, acquiescence or estoppel. But abandonment depends upon intention, expressed or implied, as evidenced by words or conduct. Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60; Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713. In the present case there is no evidence upon which we may predicate an intention to abandon during this period. During this entire time, plaintiffs maintained their own terminal in Baltimore from which they operated their motor buses to other points in Maryland and in many other States. Promptly following the inauguration of service in Maryland in May, 1928, the Greyhound System began advertising this service in the Baltimore press and during the eleven years from 1928 to 1939, inclusive, spent in excess of $46,000 for such purpose, omitting no year, in addition to several thousand dollars spent for radio and other forms of advertising.

On the question of acquiescence and laches during the six years between 1934 and 1940, the testimony of the president of each of the plaintiff companies and also of the general counsel for the whole Greyhound System is that none of them, nor any other officials charged with the duty of supervising competitive matters of this kind, had their attention called to what the defendants were doing until the year 1940, although Baltimore employees of the Greyhound System were cognizant from time to time of the character of the name and insignia carried on defendants' cabs during this period. There is no testimony on behalf of defendants that contradicts this testimony of the Greyhound officials. Accordingly, we find that by the weight of the credible evidence, there was no acquiescence on plaintiffs' part in what defendants were doing between 1934 and 1940, and also that plaintiffs' laches were not of a kind to create an estoppel.

We turn to the second period, namely, that from 1940 until 1943 when defendants, without notifying the plaintiffs, withdrew from the Diamond System and commenced again to use the Greyhound name and symbol in the same conspicuous manner that had led the plaintiffs in 1940, to file suit, which was dismissed two years later because of the fact that defendants had become members of the Diamond System in 1941, had abandoned permanently, as plaintiffs thought, the use of the running dog symbol and also, at least as far as indication to the public was concerned, the use of the name "Greyhound" on their cabs, since they had reduced the lettering to a small and very inconspicuous size on the cab doors so that it was completely dominated by the Diamond insignia. During this second period there likewise is no proof of abandonment or acquiescence on the part of the plaintiffs, or of any laches that would give rise to an estoppel. Plaintiffs very materially increased the extent of their advertising in Baltimore during this period, and expended a half-million dollars on a new—their present—terminal in Baltimore. As for the defendants, the increase in their advertising was not at all comparable to that of the plaintiffs'.

Lastly, we turn to the third period, from 1943 to 1947 when plaintiffs protested through their Baltimore counsel against defendants' use of the name "Greyhound" and the running dog insignia, but were unsuccessful and on July 20, 1948, the present suit was filed.

During this period of four years the testimony indicates that certain of the plaintiffs' responsible officials did become aware of the fact that defendants had reverted to using the "Greyhound" name and insignia, as they had done before they joined the Diamond System in 1941, but made no protest until 1947, that is, after a lapse of about four years. Plaintiffs give the War

as the reason for this delay, i.e., they assert, supported by testimony of their presidents, that their operations were so much a part of the War emergency requirements that they overlooked for the time being the infringements committed by the defendants.

■ We believe this is a meritorious answer to defendants' contention. It is conceded that at no time during this four year period did plaintiffs do anything indicative of abandonment of the name "Greyhound" or the running dog insignia, or of acquiescence in their use. On the contrary, their advertising in and near Baltimore was materially increased, just as it was all over their nation-wide system, and they continued to use their insignia just as they had been doing since 1928.

As to laches and acquiescence we believe that defendants' conduct was tantamount to fraud when, without notice to plaintiffs, they withdrew from the Diamond System and reverted to the same use of plaintiffs' trade name and insignia that they had followed prior to dismissal of the suit in 1942. While it is true there was, unfortunately, no formal agreement defining precisely what defendants were permitted to do after dismissal of the suit, it is obvious that the real consideration for the dismissal was defendants' entrance into the Diamond System and the consequent alteration of the name and insignia on their cabs so as to be no longer objectionable.

■ Laches in the sense of mere delay are not in and of themselves necessarily a ground for denying injunctive relief—although they may be ground for denying an accounting for profits, which plaintiffs are not seeking in the present suit. McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828; Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526; Saxlehner v. Eisner & Mendelson Co., supra. The passage of time is not as important as the circumstances surrounding it. With the War emergency, in the field of transportation, competition, in the ordinary business sense, was suspended, or was expected by our Government to be suspended, and all efforts concentrated upon meeting Governmental, not private demands. Thus such considerations as trade name infringement or unfair com-

petition may very well have been precluded from consideration by the plaintiffs for the time being, without destroying any rights theretofore possessed by them with respect to maintaining their full status as a private business enterprise.

■ Under all the circumstances, we feel the most that could possibly be said for defendants' position is that by 1942, when the original suit against them in this Court was dismissed, they had acquired the right to use the word "Greyhound" only—not the running dog symbol—in small letters as part of their firm name, Greyhound Cab Co., on the doors of their cabs, as in the nature of a sub-title, an explanation of their status in the Diamond System; and similarly, that they had acquired the same right with respect to their letterheads, checks, etc. However, they clearly lost this right through their failure to confine their use of the name "Greyhound" to this very limited extent after plaintiffs dismissed the suit in 1942 on the understanding-clearly implied-that such limitation would be permanently adhered to, otherwise plaintiffs would have the right to reopen the whole matter, and contest defendants' right to use the word "Greyhound" in any manner.

■ Thus, delay in protesting, or acquiescence implied by silence, in order to constitute ground for denial of relief by injunction, must be accompanied by circumstances non-existent here. These defendants did not begin their use of plaintiffs' name and insignia innocently, or in ignorance of plaintiffs' long user. On the contrary, when defendants began using the name "Greyhound" and the running dog symbol, they were fully aware of the fact that plaintiffs had been using them for a number of years. Defendants did not begin their user in a remote territory, or in a business unrelated to that of plaintiffs. On the contrary, defendants, while not competing with plaintiffs, were nevertheless in the same general field of business, i.e., transportation, and supplied part of a well recognized and, in fact, indispensable adjunct to plaintiffs' business, i.e., service to and from the plaintiffs' bus terminals in Baltimore. During the periods that plaintiffs

did not protest against what defendants were doing, the growth of the latter's business was in no sense comparable to the growth of plaintiffs' business. In 1947 the Greyhound System spent $26,000 for advertising in the Baltimore area alone, and since 1934, through most of 1948, it has spent over $200,000 for the same purpose; whereas for the same period the defendants have spent approximately only $18,000. Today, Greyhound's total capital investment in Baltimore is about $2,500,000, while the defendants' is about $125,000. In the face of these circumstances, coupled with the distinctive, unusual character of plaintiffs' name and symbol, it is clear that defendants' conduct constituted a deliberate, unfair trade practice which plaintiffs are entitled to have enjoined in spite of their tardiness in seeking such relief.

Where infringement is deliberate and fraudulent, the elements essential to estoppel are lacking, and the protection of a plaintiff's rights by injunction should not be denied. Thus, the Supreme Court in Saxlehner v. Eisner & Mendelson Co., supra, while holding that inexcusable delay had been established in connection with rights in the word "Hunyadi" which the defendants and other infringers had been using in good faith for twenty years while the plaintiff took no action, nevertheless granted an injunction against the copying of plaintiff's bottle and label with respect to which the infringers had not acted in good faith.

The following statements in Chief Justice Fuller's opinion in Menendez v. Holt, supra, 128 U.S. 514, at pages 523, 524, 9 S.Ct. 143, at page 145, 32 L.Ed. 526, are directly applicable to the facts in the present case: "The intentional use of another's trade-mark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it. Persistence, then, in the use is not innocent, and the wrong is a continuing one, demanding restraint by judicial interposition when properly invoked. Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long, and under such circumstances, as to defeat the right itself. Hence, upon an application to stay waste, relief will not be refused on the ground that, as the defendant had been allowed to cut down half of the trees upon the complainant's land, he had acquired by that negligence, the right to cut down the remainder. Attorney General v. Eastlake, 11 Hare 205. Nor will the issue of an injunction against the infringement of a trade-mark be denied on the ground that mere procrastination in seeking redress for depredations had deprived the true proprietor of his legal right. Fullwood v. Fullwood, 9 Ch.D. 176. Acquiescence, to avail, must be such as to create a new right in the defendant. Rodgers v. Nowill, 3 De Gex, M. & G. 614. Where consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and silence merely, 'it lasts no longer than the silence from which it springs. It is, in reality, no more than a revocable license.' Duer, J., [Amoskeag] Mfg. Co. v. Spear [& Ripley] [4 N.Y.Super.Ct. 599], 2 Sandf. 599; Julian v. [Hoosier] Drill Co., 78 Ind. 408; Taylor v. Carpenter [Fed. Cas.No.13,784], 3 Story 458; [2d., Fed. Cas.] 13, 785, 2 Woodb. & M. 1.

"So far as the act complained of is completed, acquiescence may defeat the remedy on the principle applicable when action is taken on the strength of encouragement to do it, but so far as the act is in progress and lies in the future, the right to the intervention of equity is not generally lost by previous delay, in respect to which the elements of an estoppel could rarely arise. * * *"

Obviously no standard or rule can be stated in terms of years that will apply to every case. The particular facts as disclosed in each case must control. It is, therefore, scarcely necessary to cite more than a few cases in this branch of the law where decisions are legion. Suffice it to point out that in the following cases the delay complained of varied from one and a half to twelve years, and yet the circumstances were held to justify the granting of permanent injunctive relief: Dr. Peter H. Fahrney & Sons Co. v. Ruminer, 7 Cir., 153 F. 735. Delay of four years. O. & W. Thum Co. v. Dickinson, 6 Cir., 245 F. 609. Delay of twelve years. Harvey v. Ameri-

can Coal Co., 7 Cir., 50 F.2d 832. Delay of three years. Standard Oil Co. v. Michie, D.C., 34 F.2d 802. Delay of one and a half years. Noll v. Rinex Laboratories Co., D.C., 25 F.Supp. 239, affirmed 6 Cir., 99 F.2d 1013. Delay of seven years. Great Atlantic & Pacific Tea Co. v. A. & P. Cleaners & Dyers, D.C., 10 F.Supp. 450. Delay of three years.

For the reasons herein given a decree will be signed permanently enjoining the defendants from using either the word "Greyhound" or the picture or symbol of a greyhound dog upon their taxicabs in or about the City of Baltimore, or in connection with any phase of the operation of such taxicab business; with the proviso, however, that such decree shall not become effective until sixty days after its date in order that the defendants may have a reasonable time within which to take such steps as may be necessary to comply with the decree.