THE PERRY KNITTING CO. et al.

v.

MEYERS et al.

United States District Court,
S. D. New York.
April 12, 1954.

Munn, Liddy, Nathanson & March, New York City (Sylvester J. Liddy and Arthur L. Nathanson, New York City, of counsel), for plaintiffs.

John P. Chandler, New York City, for defendants.

LEIBELL, District Judge.

This is an action for infringement of a registered trade mark and for unfair competition. ' Plaintiff, The Perry Knitting Company, is a manufacturer of knitted garments of various kinds, including children's sleeping garments. The other plaintiff, Glendale Knitting Corporation, was wholly owned and controlled by Perry and was the selling agent for Perry. They were related companies within the meaning of Sections 1055 and 1127 of Title 15 U.S.C.A. Glendale was originally incorporated as Nitey Nite Sleeping Garment Corporation in 1940 but a year later its name was changed to Glendale Knitting Corporation. Since January 5, 1953, Glendale has been merged in Perry and Glendale is now the Glendale Division of The Perry Knitting Company.

On August 18, 1925, trade mark registration No. 202,164 was issued by the United States Patent Office, under the Act of 1905, to The Perry Knitting Company for the mark Nitey Nite for "Children's Sleeping Garments in the Nature of a Combination Garment with Feet Attached". The application for the trade mark was filed November 29, 1924, and

stated that the mark had been continuously used in the business of the applicant since June 27, 1924. The words "Nitey Nite" are "displayed in a single line in a kind of stylized capital and lower case type". The registration was renewed in 1945 and is in full force and effect.

Plaintiff has continuously used the trade mark Nitey Nite for infants' and children's sleeping garments since June 27, 1924. During the fourteen year period from 1940 to 1953 plaintiff sold over $35,000,000 worth of merchandise bearing the trade mark Nitey Nite, 85% of their total sales. During the same period they spent about $2,000,000 for advertising.

For about fourteen months prior to the institution of this action on March 30, 1950, the defendants, Al Meyers and Sol Meyers, did business as Mighty Mite Co. and used the trade mark Mighty Mite. On November 1, 1952, after this suit was started and after the hearing before the Interference Examiner in the Patent Office in relation to defendants' trade mark application had been closed, they incorporated Mighty Mite Inc., which has succeeded to the assets and business of the former partnership. By stipulation, Mighty Mite Inc. has been added as a defendant in this litigation.

While the individual defendants were doing business as Mighty Mite Co. they filed, on February 1, 1950, an application in the United States Patent Office for the registration of Mighty Mite as a trade mark for "certain garments for infants and children, namely, creepers, cardigan sweaters, polo shirts, pajamas, and outer suits formed in one, two and three pieces". In the trade mark application, the words "Mighty Mite", both in bold lower case letters, with the word "Mighty" above the word "Mite", were superimposed on what appears to be an unfinished representation of a globe (the earth).

Plaintiff, Perry, successfully opposed the defendants' application. On November 17, 1952, the Examiner of Interference ruled that the applicants (defendants) were not entitled to register the mark Mighty Mite. The Assistant Commissioner, on October 30, 1953, affirmed the Examiner's decision and it has become final. Despite that ruling defendants continued to use the mark and trade name Mighty Mite. Plaintiffs instituted this action on March 30, 1950, while the opposition proceedings were pending in the Patent Office. In July 1952 defendants ceased manufacturing sleeping garments, but continued manufacturing the other children's garments mentioned in the application for the trade mark Mighty Mite. In the summer of 1953 defendants announced that they would sell pajamas of their "Saginaw" company.

The Assistant Commissioner of Patents ruled that under the Act of 1946 it was not necessary for the opposer (Perry) to show that the applicants' (defendants') proposed mark would be used on "goods of the same descriptive properties" as the opposer's (Perry's) goods. The Commissioner ruled "the proper test to be applied is whether or not the goods are of such nature that, if marketed under the same or confusingly similar marks, the purchasing public is likely to believe that they emanate from the same source". He held that the "Mighty Mite" goods were of a type or character which the public might reasonably assume to be manufactured and sold by Perry, the prior user of the mark Nitey Nite, as additional products in Perry's "line".

As to the similarity in sound of the two marks Nitey Nite and Mighty Mite, the Commissioner stressed its importance in these days of radio and television advertising. See also—Restatement, Torts, § 729(a)(ii), Comment (c).

■ The decision of the Patent Office on the questions of similarity of the two marks in oral speech, and the likelihood of confusion of the purchasing public, although not res judicata, nevertheless carries substantial weight, because of the Commission's familiarity in dealing with such problems. Miles Shoes,

Inc. v. R. H. Macy & Co., Inc., 2 Cir., 199 F.2d 602.

Defendants attack plaintiff's trade mark, contending that it is only descriptive of the merchandise and hence invalid, citing Franklin Knitting Mills v. Fashionit Sweater Mills, 2 Cir., 4 F.2d 1018. But that case involved a trade mark that was a combination of two words in common use and was descriptive of the product on which the trade mark was used. Here we have a mark Nitey Nite that is derived from the practice of saying "Good Night" to children by using the words "Nighty Night"—grown-ups' affectionate baby talk. The testimony in this case shows that the appropriateness of the mark occurred to one of plaintiff's salesmen when saying "Good Night" to his children. It has been applied by plaintiff to children's sleeping garments of various kinds, night drawers with feet attached, pajamas, sleeping bags and the like. It is not descriptive. It is fanciful and suggestive. It is registrable under the Statute and is valid.

" 'That a designation may have a suggestive significance in connection with the goods does not render it inappropriate for use as a trademark. The test is the imaginativeness involved in the suggestion, that is, whether the suggestion is so close and direct that it is apparently descriptive and generally useful in approximately that form to all merchants marketing such goods or is so remote and subtle that it is fanciful and not needed by other merchants of similar goods.' 3 Restatement, Torts, § 721, comment a (1938)." Douglas Laboratories Corp. v. Copper Tan, Inc., 2 Cir., 210 F.2d 453, 455.

Plaintiff's mark meets the above test.

Plaintiff adopted the mark in 1924, registered it in 1925, and has used it continuously. Plaintiff has advertised the mark Nitey Nite nationally and as much as 5% of the gross receipts has been spent for advertising by plaintiff.

Plaintiff's retail customers have also advertised it locally. The mark has acquired a secondary meaning as indicating plaintiff's goods exclusively. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315 at page 336, 59 S.Ct. 191, 83 L.Ed. 195. There is no proof of any substantial sums spent by defendants for advertising purposes. I may assume that if the proof were available, it would have been offered. Defendants' total sales, down to July 1953, amounted to about $375,000 of which about 4% were children's pajamas.

Defendants' adoption of the mark and trade name Mighty Mite was with full knowledge of plaintiff's registered trade mark Nitey Nite and with an appreciation of the similarity in the two names, especially in oral speech. That is admitted. The explanation given by defendants of the circumstances under which the defendant partnership, formerly known as Mite-ee Tot Co., changed its name and trade mark to Mighty Mite is not convincing. The story told is that Sol and Al Meyers had a third partner, named Rosner, with whom they had some legal controversy, and that in order to avoid the possibility of Rosner winning his suit and the right to the Mite-ee Tot name, the Meyers brothers decided to get a clean start with a new name and all the assets of the old business, except the mark "Mite-ee Tot" which had been used only six months. It developed that there was no real basis for the Meyers' apprehension and the legal affair with Rosner produced no such result. As far as the record shows, there is nothing to prevent the defendants from resuming the use of their old mark and name.

I am satisfied that the Meyers brothers did not adopt the name and mark Mighty Mite in good faith. Further, when their right to have the mark Mighty Mite registered in February 1950 was opposed by plaintiff, they persisted in their effort to use it and did not discontinue the sale of children's pajamas with that name, until months aft-

er the Examiner of Interference ruled against them. And while this present action was pending, they incorporated their business under the name Mighty Mite, Inc., to freeze the mark into a corporate title. Last July (1953) their corporation with the "Mighty Mite" name, announced that it would sell children's pajamas, under the trade mark "Saginaw", which further complicated the situation.

This is a case where the defendant infringer appears to have intentionally sought to capitalize on plaintiff's trade mark and on the good will which had accrued to it through the years. So much has been spent in advertising Nitey Nite through the years that it is almost a brand name. The trade mark "Mite-ee Tot" which the defendants Meyers had used for only six months, had not acquired any significance at the time defendants switched to Mighty Mite. The latter mark did possess the advantage of so closely resembling plaintiff's mark in oral speech that defendants could get a "free ride" on the latter's popularity in the children's apparel field.

█ Of course, as Judge Clark stated in La Touraine Coffee Co., Inc. v. Lorraine Coffee Co., Inc., 2 Cir., 157 F.2d 115, 117, "In this area of trade-mark law, each case must be considered separately and precedents are not conclusive". But there is this question presented in most of the cases: whether or not the similarity of names is such as to make likely the confusion of any appreciable number of ordinarily prudent purchasers as to the source of the goods. Miles Shoes, Inc. v. R. H. Macy & Co., Inc., 2 Cir., 199 F.2d 602. In the case at bar we have both actual instances of confusion among retailers and also the likelihood of confusion among the purchasing public. There has been proof of eleven instances of actual confusion and the Commissioner of Patents has found that the similarity in sound in the two marks is such that it is likely to cause confusion or mistake or to deceive the purchasing public as to the source of the goods. That was a basic issue before the Examiner in the Interference Proceeding.

There is no need to tarry long on the question of defendants' use of the trade mark Mighty Mite on infants' and children's sleeping garments. Plaintiff has so used its mark Nitey Nite for a quarter of a century. Defendants' invasion of that right was deliberate and, of course, for profit. But defendants argue that plaintiff did not have the right to extend the use of the trade mark Nitey Nite to other types of children's garments after defendants used the mark Mighty Mite on such apparel; and that plaintiff's use of the mark on children's sun suits in January 1953 and its purpose to employ it on cardigans, sport shirts and the like in the near future, is not entitled to the Court's protection.

Defendants rely on the Hyde Park Clothes, Inc. v. Hyde Park Fashions, Inc., 2 Cir., 204 F.2d 223. There are a number of particulars in which the Hyde Park case differs from the case at bar. First, and most important, is the matter of defendants' good faith in adopting a trade mark or trade name so similar to plaintiff's mark. In the case at bar defendants' choice was deliberately made and for the purpose of gaining an advantage from the close similarity of the two marks. Defendants applied their mark to children's and infant's sleeping garments, such as plaintiff had made and advertised, as well as to other infants' and children's wearing apparel. That was not the situation in the Hyde Park case. There the defendant had acted in good faith and applied its name and mark principally to a special type of women's suits, covered by a patent. The plaintiff in the Hyde Park case had manufactured only men's suits and coats. Defendant manufactured women's suits and coats. The two litigants were not in competition on any manufactured item. Further, the defendant in the Hyde Park case was more than paying its own way in advertising and had spent a larger percentage of its gross income for national advertising than plaintiff had. In the case at bar plaintiff has, for years,

spent a good percentage of its gross sales in nationally advertising the Nitey Nite trade mark. Defendants have not presented any proof of any sums spent for national advertising. The defendants have not paid their own way.

In the Hyde Park case the plaintiff delayed for almost four years after notice of defendant's use of the name and mark, before bringing suit. Meanwhile the defendant had expended large sums for advertising. Here the plaintiff acted promptly both in bringing this action and in the Patent Office interference proceeding and the defendant has spent very little for advertising.

Plaintiff in the Hyde Park case argued that it had been thinking of expanding into the field of women's suits and coats. But right down to the day of trial it had done nothing concrete to show that its alleged plan was genuine. In the case at bar the plaintiff actually started manufacturing sun suits in January 1953 and sold over $50,000 of that item in that year and had made in the 1940s sweat shirts, T-shirts, pull overs and athletic shirts for men and boys. What plaintiff is now doing is to extend its business in the field of infants' and children's wear, so as to include sun suits and other new items, such as are now being made by defendants.

In the Hyde Park case the plaintiff's suits and coats would ordinarily be displayed only in the men's department, and the women's suits and coats in the women's department. But in the case of infants' and children's wearing apparel, especially for young children, sleeping garments, sun suits, cardigan sweaters, polo shirts and the like would ordinarily be displayed in the same department on counters within sight of each other.

Here the defendant wrongdoer would bar plaintiff from the Court's protection while expanding into what was formerly defendants' field on certain items. Plaintiff's expansion is a natural one, for reasons which are persuasive. Further, the expansion has actually taken place as to one item and is not just a feint at doing so.

Even if plaintiff's manufacture of infants and children's wearing apparel such as sun suits, polo shirts, cardigan sweaters and the like, were considered an "excursion into an adjacent market", the fact that the plaintiff's mark Nitey Nite is a fabricated mark which has acquired a secondary meaning denoting plaintiff as a single source or origin of the goods to which the mark is attached, would entitle the plaintiff to an injunction against defendants as infringing users, who have deliberately sought to trade on plaintiff's good will. S. C. Johnson & Son v. Johnson, 2 Cir., 175 F.2d 176 at page 180. Restatement, Torts, § 731(b), Comment (c); Greyhound Corporation v. Rothman, D.C., 84 F.Supp. 233 at page 238, affirmed 4 Cir., 175 F.2d 893.

How can the wrongdoer justly complain when all its business is now affected by the use of the mark Mighty Mite as part of its corporate name. If defendants' own deliberate and illegal acts now require a broad injunction to completely bar the use of the mark and name Mighty Mite in the field of infants' and children's wearing apparel, defendants have but themselves to blame and their burden will not be great. All that defendants need do is to change their corporate name and mark by substituting something else for the word "Mighty Mite". They would not have to look far for a substitute. Let them resume the use of the mark and name "Mite-ee Tot" which they used before they adopted the mark Mighty Mite. Or let them use the name "Saginaw" which is part of a sportswear business they have taken over. The injunction will not put the defendants out of business but it will keep them within the law in the conduct of their business. Plaintiff is entitled to effective relief. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526 at page 532, 44 S.Ct. 615, 68 L.Ed. 1161; Champion Spark Plug v. Sanders, 331 U. S. 125 at page 130, 67 S.Ct. 1136, 91 L.Ed. 1386.

I have made findings of fact and conclusions of law. The plaintiff will be

granted appropriate injunctive relief.[1] The defendants' counterclaim will be dismissed. Plaintiffs are awarded $1,000 as attorneys' fees. Settle a decree accordingly.

---

1. "XIV. The plaintiff is entitled to a judgment and decree providing for injunctive relief prohibiting any further acts of infringement and unfair competition by defendants. The injunction shall provide:—(1) That defendants cease and desist from using in any way the words 'Mighty Mite' in the manufacture or sale of infants' and children's sleeping garments, including pajamas; and in the manufacture or sale of infants' and children's wearing apparel such as sun-suits, creepers, cardigans, polo shirts and the like; and (2) that defendants shall cease and desist from using in their trade name and corporate name the words 'Mighty Mite', if defendants wish to continue to manufacture or sell any of the aforesaid infants' and children's garments and wearing apparel."